(3 App. Div. 132.)

ROZELLE v. ROSE et al.

(Supreme Court, Appellate Division, Fourth Department. March 14, 1896.)

MASTER AND SERVANT—FELLOW SERVANT.

    One who rents a room containing machinery operated by men employed by the lessor is the master of the men so employed, where they are engaged wholly with his work, and subject entirely to his control; and they are the fellow servants of a person employed by the lessee to work under the direction of one of them.

Appeal from circuit court, Steuben county.

Action by Walter Rozelle against Charles O. Rose and others for personal injuries. A judgment was entered on a verdict in favor of plaintiff, and defendants appeal, giving notice of an intention to bring up for review an order denying a motion for a new trial, made on the minutes. Reversed.

Argued before HARDIN, P. J., and FOLLETT, WARD, and GREEN, JJ.

D. M. Page, for appellants.
George N. Orcutt, for respondent.

FOLLETT, J. This action was begun March 18, 1892, by an employé against his employers, to recover damages for a personal injury, caused, it is alleged, by their negligence. During 1891 the defendants were, and ever since have been, partners, under the firm name of the Truss & Cable Fence Company, at Hornellsville, N. Y., engaged in manufacturing wire for the construction of fences. In April and May, 1891, the defendants occupied a room in the factory of the Hornell Iron Works, in which there was machinery operated by the employés of that corporation. The room was occupied under a contract by which the defendants agreed to pay to the corporation the wages paid by it to such of its employés as should be engaged on defendants' work, with an advance of 50 per cent. on such wages, and also pay for the material which it should furnish to the defendants. Before April 11, 1891, only two persons worked in this room, —William W. Dyer and his son, William K. Dyer, then about 20 years of age. The Dyers were employés of the Hornell Iron Works,

but were engaged on defendants' work under the arrangement above mentioned. On the 11th of April, the defendants had in this room one machine with which wire was braided into cables or strands suitable for building wire fence, and they were also engaged in constructing a new machine for braiding wire. The old machine is known in this litigation as "No. 1," and the new machine as "No. 2." The new machine differed somewhat in construction from No. 1, and it was expected that No. 2 would be an improvement on No. 1. The members of defendants' firm took personal interest in the construction of No. 2, and visited the room daily, and sometimes several times each day, made suggestions, and gave directions to the elder Dyer about it. While No. 2 was being built, No. 1 was operated by Dyer and his son. It was connected by a belt with a shaft which extended through the upper part of the room, by means of which power was transmitted from the engine to No. 1. The plaintiff testified that, when injured, he was 20 years old, and that until he became 16 years of age he attended a common school at Mansfield, Pa., where he received a fair common-school education. When he was 16 years old, he began work at blacksmithing at Mansfield, and continued such work at that place, at East Troy, Pa., at Cortland, N. Y., at Hornellsville, in the shops of the Erie Railroad, and in a shop on a stock farm near Hornellsville, until about the time he was employed by the defendants. He testified that he had not worked much about machinery, but that, in the room in the Erie shops in which he worked, there was a trip hammer and a grindstone, which were operated by power transmitted by belts and a line shaft. This was the situation of the room and of the business carried on in it on the 11th of April, 1891, when the plaintiff was employed by the defendants, and such was the plaintiff's previous experience as a mechanic. It should be borne in mind that, before April 11th, only two persons, Dyer and his son, were employed in this room, and, after that date, only three persons, the plaintiff and the Dyers. April 11, 1891, the defendant Charles O. Rose, in behalf of his firm, employed the plaintiff, and directed him to report to William W. Dyer, and to follow his directions. On the afternoon of that day, the plaintiff began work in the room described, wherein he continued to labor until May 29, 1891, when he was injured. He thus describes his labors:

"The first work I did after I went there, Dyer showed me how to feed the machine, and put it in operation, and he showed me how to place the spools in the machine, with the wire on them, and how to oil it. I don't think he gave me any other instructions at that time. The first work I did was to see that the wire was kept in the machine, and feed the machine with the wire. It did not require all my attention while attending to that machine, and I did other work besides feeding this machine. I helped around at different things, whatever he wanted me to do,—to sweep out the place, and pick up pieces of iron on the floor, and put things in place; and, when he wanted any help to lift iron or anything, I did it. The wire was wound on spools, which I fed to the machines. The spools were set on pins, and there was four places where the spools set in, and they kept revolving all the time, and, when a spool was empty, we put another in its place. Dyer did not give me any instructions as to the method of working that machine. He did not at any time call my attention to any danger connected with the belting, or with any belting, or shafts or shafting, nor did either of the defendants, or any other person. They never described to me any method of lacing belts or belting. * * * At the time I was employed there,

there was a second machine in process of construction, and similar to the other machine, and was designed for the same purpose. Dyer and his son were working upon the new machine. No other person, to my knowledge, other than Rishel and Rose, came into the inclosure, and gave directions about the work. I helped Dyer put the second machine together. There was a time when the old machine broke down, and, when that occurred, I would inform Dyer, and he would fix it, or see it fixed."

In the forenoon of May 29th, the new machine was completed, and, while being tested, the belt connecting it with the line shaft broke twice. When it first broke, Dyer mended it alone, and the second time a new piece of belting was procured; and, after dinner, William W. Dyer, assisted by the plaintiff, began to splice or unite the belt. At this time, the shaft, which was connected with the other machinery of the Hornell Iron Works, was in motion. Whether the motion of the shaft could have been stopped without stopping the other machinery of the corporation does not appear. The shaft was 3 inches in diameter, and the belt 34 feet long, and $3\frac{1}{2}$ inches wide.

The plaintiff described the accident as follows:

"After I returned from dinner, Friday afternoon, there was something said to me in regard to some service connected with the new machine. That was the 29th of May, 1891. I was wiping the old machine with a piece of waste, and Dyer spoke to me, and motioned with his head for me to come to him; and I went over, and he told me to go and get a ladder, and put it up against the shafting, and get on to it, and hold the belt; and I went out, and found the ladder, and put it against the shafting, and got on to it, and stood against the ladder with my right side against the ladder. I think the shaft was about three inches in diameter. The Court: What did he tell you to get on the ladder for? A. To hold the belt that was to be attached to the new machine. Q. Did he tell you where to go with the ladder? A. He did motion with his hand to put it against the shaft over there. I couldn't say, after I started for the ladder, whether Dyer did anything at the time he told me to go and put the ladder against the shaft. He did not do anything at the time he made the remark. I have heard that this shaft was revolving 130 times a minute. The shaft was probably two feet above the top of the inclosure, and a little to one side; may be a foot or eighteen inches to the south, so that the shaft was outside of the inclosure. The shaft was eighteen inches or two feet from the joists, and revolved towards the inclosure, and away from the side upon which the ladder was placed; and the ladder was outside of the inclosure, and the completed machine stood within the inclosure. The belt, when I returned with the ladder, was over the shaft. The new completed machine was within the inclosure, and 15 or 17 feet from the line shaft. After I got on the ladder, Dyer told me to take hold with my right hand, and grip the belts together, and I did so. I leaned with my right side against the ladder, and put my arm through the ladder, and gripped the belts together, six or eight inches below the shaft. The top of my head, with respect to the shaft, I should say, was about even with the shaft. My right arm, with reference to the shaft, as I gripped the belt, was below the shaft. My right hand was six or eight inches from the shaft as I gripped the belt. There was nothing to obstruct Dyer's view of me in that position. After I gripped the belts, he proceeded to sew the ends together. As he was sewing the belt, and I was holding it, the lower loop in the belt was around the pulley on the machine. The belt was loose as it rested over the shaft. Before the machine was put in operation, I suppose the pulley had to be put on the line shaft. Nothing was said to me by Dyer about that. While I was holding the belt, the belt commenced to squeak, and he hollered to me to drop the lower belt with my right hand, and take my left hand, and push the belt over the shaft until a cool place rested on the shaft; and I attempted to do so, and put my left hand on the top of the shaft, on the belt, and the instant the belt started to go over it formed a loop between my right hand and the left; and, instead of running off the shaft, the top part of the belt followed the shaft around, and caught the fingers of my left hand, and I jerked

them off, and, in less than an instant, my right hand was caught. Q. How was your right hand caught? A. As the two belts running around the shaft were caught in a loop. There was a round of the ladder over my shoulder, and another under my arm, and it wound the arm around the shaft; and, as it was winding up, it drew the ladder up with me from the floor, and the ladder caught over head, so that it didn't go around the shaft; and, after the arm went up as far as the ladder would let it, it came loose, and pulled off. After that, the belt broke from the machine below, and commenced to fly, and it was stretching towards me like rubber, and it shot right at me, and flapped around me and the ladder, and bound me, and I was drawn tight to the shaft, until it burned me across the back, to the end of the stump. I had to stay there until the machinery ran down. They stopped the machinery, and Dyer came, and put one barrel on top of another, and caught onto it, and took his knife, and cut the belt, and I was taken down. An amputation of the stump was performed by a physician."

The Dyers were engaged solely on the work of the defendants, were wholly subject to their control, and were their employés. The fact that the defendants paid the Hornell Iron Works for the services of the Dyers did not render them employés of that corporation, as between themselves and the defendants, or as between the defendants and the plaintiff. During the whole period of the plaintiff's employment, he and the Dyers had worked together in the room and in the manner described. They directly co-operated with one another in the business in which they were engaged, and their usual duties brought them constantly together, so that each could exercise an influence upon the other, and induce proper care and caution. These three persons, the Dyers and the plaintiff, were co-employés or fellow servants. The fact that the elder Dyer had had the most experience, and was authorized to give directions to the other two in respect to their common work, did not render him the vice principal of the defendants. Malone v. Hathaway, 64 N. Y. 5; Loughlin v. State, 105 N. Y. 159, 11 N. E. 371; Crown v. Orr, 140 N. Y. 450, 35 N. E. 648; Faber v. Manufacturing Co., 126 Pa. St. 387, 17 Atl. 621.

At the time of the accident, these three fellow servants were engaged in the performance of the duties which were liable to arise in the conduct of the work in which they were engaged. Belts had frequently broken before, and been mended, and the operation of mending a belt cannot be regarded in any sense as a master's duty. It was a service which these three persons, in the ordinary course of their duties, were bound to perform. The case was submitted to the jury on the theory that if the elder Dyer was negligent in directing the plaintiff to hold the belt, and the plaintiff was injured without contributing by his own negligence to the accident, the defendants were liable; and upon this theory the court refused to nonsuit the plaintiff. In this, I think, the court erred. If Dyer were negligent in directing or allowing the plaintiff to perform this service, it was but the negligence of a fellow servant, for which the defendants are not liable. It should be observed that these three fellow servants had been employed in the same service in a small room, where there was little machinery, and that simple in its character, for six weeks, and each had an opportunity of observing the care and skill of his co-em--

ployés. It is not alleged in the complaint, nor was it proved on the trial, that the Dyers were not skillful and competent mechanics, and fit for the service in which they were engaged, and this plaintiff had full knowledge in respect to their competency. It is not asserted that the place in which this work was done was unsafe, or that any of the machinery employed was dangerous or defective, and the whole of it was open to the observation of this plaintiff. It was asserted that other and safer methods might have been adopted for lacing this belt. It was shown that sometimes a belt, while being mended, is suspended by a cord above and away from the revolving shaft. At other times a belt is clamped together a few inches below the revolving shaft, and then held away from the shaft, and that a belt is sometimes mended by a person standing on the ground, and holding it while it is being laced. The latter method is more difficult, because the person holding the belt is further from the shaft, and cannot lift it from the shaft, but it has this advantage: if friction is developed between the shaft and the belt, and the belt is drawn around the shaft, the person holding it is far enough away from the shaft to let go of the belt, and escape danger. At the time of this accident, there were clamps in use in the Hornell Iron Works which were frequently used in repairing belts. These fellow servants were not directed by the defendants to employ any one of the methods usually adopted for mending belts while the shaft is in motion. They adopted their own method, and the result was a most distressing accident, for which, however, there is no warrant in the evidence for holding these defendants liable. The judgment and order should be reversed, and a new trial granted, with costs to abide the event.

Judgment and order reversed, and a new trial ordered, with costs to abide the event. All concur.