BALDWIN v. ABRAHAM et al.

(Supreme Court, Appellate Division, Second Department. January 11, 1901.)

DELIVERY WAGON—DRIVER'S NEGLIGENCE—MASTER'S LIABILITY—PRIMA FACIE CASE—REBUTTAL.

Plaintiff proved that she was injured by the negligence of the driver of a wagon which at the time of the accident bore defendant's firm name on a canvas strip along the sides, and was precisely like others which on the day in question were loaded at their store; and it was undisputed that it was loaded with their goods, en route for delivery to their customers. *Held* to make out a prima facie case, not rebutted by the simple affirmation of defendants that they had hired the driver and outfit from some unnamed and undisclosed stranger.

Goodrich, P. J., dissenting.

Appeal from trial term, Kings county.

Action by Lois E. Baldwin against Abraham Abraham and others. From a judgment for plaintiff, and from an order denying a new trial, defendants appeal. Affirmed.

Argued before GOODRICH, P. J., and WOODWARD, HIRSCH-BERG, and JENKS, JJ.

Edward M. Grout, for appellants.
Charles J. Patterson, for respondent.

HIRSCHBERG, J. The evidence establishes the fact that on Christmas eve in 1898 the plaintiff, while lawfully upon the public streets in Brooklyn, was seriously injured, without fault on her part, by the negligence of a driver engaged at the time in delivering to defendants' customers goods which the defendants had sold and agreed to deliver. No exception was taken by the defendants to the charge of the learned trial justice, every request made by them having been duly charged, and the only question for review is whether he should have nonsuited the plaintiff on defendants' motion. The evidence discloses no person or persons, by name or other identity, responsible for the driver's negligence, other than the defendants, and the plaintiff is therefore without remedy in the redress of her misfortune if their contention be adopted by the court. In my opinion, only the clearest requirements of law and justice will justify such a disposition of the case. The defendants were proprietors of a large department store in Brooklyn, and were the owners of 70 vans, which they used throughout the year in delivering their goods to purchasers. This number was insufficient for the holiday trade, and they accordingly hired 40 additional vans for the two weeks immediately preceding Christmas day. Of this additional number, 30 were hired under written contract, and included

the use of a driver and helper in each instance; the form of the written contract being as follows:

"This agreement entered into between Abraham & Straus and P. Belford and Son: Abraham & Straus agree to engage six two-horse vans for a period commencing December 12th, 1898, and terminating December 24th, 1898, at the rate of $8.00 per day per van. In consideration of above, P. Belford and Son agrees to furnish Abraham & Straus with six two-horse vans, driver and helper, to be responsible for the proper collection and prompt return of all C. O. D. moneys, and for the safe delivery of all goods intrusted to their charge.

"Nov. 10, '98.                                    P. Belford & Son."

All the hired vans were engaged or obtained from nine persons or firms, and five of these contracts were produced upon the trial; the other four written contracts having been lost or misplaced. The remaining 11 vans were hired without any written contracts. As to these 11, there was no direct or explicit evidence as to the terms of the hiring, or as to whether or not they included the services of drivers and helpers. It might be assumed that the 11 were hired under the same terms and conditions as were the 30, in order to support a judgment of the supreme court, but it would hardly seem proper to adopt such a presumption for the purposes of a reversal. The burden of establishing the defense relied on in this case rests with the defendants. Seaman v. Koehler, 122 N. Y. 646, 25 N. E. 353. The evidence establishes the fact that the plaintiff received her injuries from one of the 41 hired vans. It bore the defendants' firm name, painted in black letters on a strip of white muslin about two feet wide, and running the length of the truck, while the vans owned by the defendants were covered with black oilcloth, lettered in gold. The driver drove away upon the happening of the accident, and it was accordingly impossible for either party to prove which of the 41 vans did the mischief, from whom it was hired, or whether it was hired orally or under written contract. For the same reason the case is void of proof as to the occupation of the owner or owners of the van or truck in question, and as to the general occupation of the driver,—whether he was one of the defendants' servants, whether he was a servant in the general employment of such owner or owners, or whether he was specially hired by such owner or owners to drive for these two weeks in the business of the defendants' deliveries. The plaintiff proved that the wagon driven at the time of the accident bore the defendants' firm name on a muslin or canvas strip along the sides, and was precisely like others which on that day were loaded at their store; and it was undisputed that it was loaded with their goods, en route for delivery to their customers. This certainly made out a prima facie case, and it would have been error had the learned trial justice granted the nonsuit applied for at the close of the plaintiff's case. Seaman v. Koehler, supra; Hodgson v. Conklin, 50 App. Div. 604, 64 N. Y. Supp. 76. The defendants produced their delivery superintendent as a witness on their behalf, and he testified on direct examination to the facts hereinbefore detailed in reference to the number of vans owned and the number hired by them, with their distinguishing marks, and further testified, in answer to a direct question, that

the vans with a muslin or canvas strip, such as the plaintiff had described, were not "in the possession of, or under the ownership or control of, the defendants." Had the evidence rested here, it would still seem that a nonsuit would be improper, for the superintendent's relation to the defendants was such as to present the question of his credibility for consideration. Dean v. Van Nostrand, 23 N. Y. Wkly. Dig. 97, and Lamb v. Insurance Co., 22 App. Div. 552, 556, 48 N. Y. Supp. 123. But the superintendent was cross-examined as to the exercise of control over the hired vans by the defendants, and his statement that the defendants had no control over such vans was considerably shaken. He had testified that he made the contracts for the 30 vans which were obtained under written contract, and that the strips bearing defendants' name were prepared, furnished, and owned by them. He was then asked and answered as follows:

"Q. Why did you furnish these strips with 'Abraham & Straus' on for these wagons? A. For the purpose of advertisement. Q. For the purpose of advertising that they were your wagons? * * * A. Yes; I guess so. Q. What? A. Yes, sir. Q. Then you regarded them as your wagons for the purpose of these deliveries, didn't you? * * * A. Yes, sir. * * * Q. Don't you require the person who received the goods to give some evidence that they got them? A. In fragile articles; yes, sir. Q. You sent fragile articles out by these men? A. Yes, sir; we have a form of receipt for that. The Court: That is what he is asking about. Did you give any of these drivers any book of any kind to take with them for use? The Witness: We gave them a receipt, not a book. It is a printed slip, specifying, for instance,—such as dinner sets,—so many hundred pieces. Q. And that they get them in good order? A. Yes, sir. Q. You furnished them with these receipts to get for you, did you? A. Yes, sir. Q. Did you furnish these to each driver? A. Yes, sir. * * * By the Court: Q. What duty has the driver about them when he comes to deliver that particular package? A. He takes this receipt, delivers his goods, and gets his receipt signed. Q. And brings it back to you? A. Brings it back to the house. By Mr. Patterson: Q. That he was doing for you, wasn't he? A. For Abraham & Straus; yes, sir. Q. He was to do it for Abraham & Straus, and he was to do it under their direction, wasn't he? A. Yes, sir. Q. He was delivering all these goods for Abraham & Straus, wasn't he,—all the goods he had in the wagon? A. Yes, sir. Q. And Abraham & Straus were having that man do their work, weren't they,—each of these drivers on a hired wagon? * * * A. Yes, sir. Q. They were doing the work entirely under your direction, weren't they? A. Under my direction? Q. Yes; under the direction of Abraham & Straus? A. Well, we did not look at it in that light; no sir. Q. You do not mean to say that they did not have to go where you sent them? A. So much that we gave them the route to do; yes, sir. Q. They had to go and do that route? A. Yes, sir. Q. Then they were doing that under your direction, weren't they? A. Yes, sir. Q. The delivery of goods was under your direction? A. Yes, sir. * * * Q. Did you ever call the attention of these drivers of these hired vans to the necessity of handling these fragile packages with great care? A. Individuals I have. Q. Individuals, yes. Have you? A. Yes, sir. Q. Wherever you saw these men were not handling the property right, you called their attention to it, didn't you? A. Yes. Q. And spoke to them sharply, too, didn't you? A. Yes. Q. You had authority over them, didn't you? A. Well, to that extent; yes, sir. Q. You had authority to direct them how they should handle your goods, did you not? A. I assumed it. Q. You had it, didn't you? A. Yes; I suppose I had it. Q. You believed you had it? A. Yes, sir. * * * By the Court: Q. Did you have some other man in your department, under you, helping you about your general work in connection with the delivery? A. Yes, sir. Q. About how many in number? A. En-

tirely, do you mean? Q. Yes; at this time. A. I don't know the exact figures, but about three hundred or four hundred people. By Mr. Patterson: Q. I had particular reference to this department of telling a man to take a particular bin and sending off the truck. A. We had one man in charge of the driveway. Q. Who is that? A. His name is Seagrift. Q. Is he here? A. No, sir; he is not here. Q. When the truck came in after delivering its load, did you ever send the driver out again? A. Yes, sir. Q. You sent the driver out again if the owner of the truck was not there? A. Yes, sir. Q. You would assume full control over the truck if the owner was not there, wouldn't you? A. Yes, sir. Q. And full control over the man? A. Yes, sir; so far as sending him anywhere. Q. So far as telling him where to go? A. Yes, sir. Q. Where to go first and where to go last? A. Yes, sir. * * * The Court: Q. Who controlled whether the wagon was sufficiently loaded or not? Who looked after that? The Witness: One of my assistants; this man Seagrift. We would judge nearly what was a load. Q. If he didn't think the man had load enough, he could put more on him, could he? A. Yes, sir; if such was the case. * * * Q. You gave precisely the same kind of directions to these men on the hired vans as you did to your own men, didn't you? A. No, sir; I don't think so. Q. What was the difference in the directions you gave to them? A. Our own men,—and what I mean by our own men, the men on our regular pay roll,—they are on a regular route, and they come there and take their route. The Court: They knew their business, and did not need so much instruction? The Witness: That is the idea. Q. Then you gave more instructions to the men on the hired vans than you did to your own? A. Yes, sir; we gave no instructions, outside of telling them to take that bin. Q. You told them to take that bin? A. That route. Q. Then the delivery sheet contained the directions of where they were to go? A. It was a summary of all the goods they had in the wagon. Q. What packages they had, and where they should be delivered? A. Yes, sir."

The superintendent was the only witness called by the defendants who gave any evidence on the question under consideration, and these citations from his testimony indicate that the defendants did exercise some control over the delivery of their goods by the hired wagons. It seems to me to justify the conclusion that the unknown owner of the truck in question could not be said, as matter of law, to have contracted independently for the delivery of the defendants' goods, even if the truck was hired with driver and helper under one of the written contracts. If it was one of the 11 trucks not so hired, I fail to see how, under any view, the court could refrain from submitting to the jury the question of who in fact was in charge of the truck at the time of the accident. Certainly no authority can be found in this state to support the proposition that a merchant sued for injuries inflicted upon the street by one driving a wagon bearing his name and loaded with his goods can have the case dismissed on his simple affirmation that he had hired the driver and outfit from some unnamed and undisclosed stranger, yet the adoption of this proposition is a necessity to the reversal of the plaintiff's judgment. Even on the forced assumption that the truck in question was one of those hired by written contract, the law would seem well settled in this state to the effect that a question is presented for the consideration of the jury. They would be required to decide, under the terms of the contract, viewed in the light of its purpose and the mode actually adopted in its execution and performance, whether the contractor actually made the deliveries, or whether his contract was limited to furnishing the defend-

ants with the means to enable the latter to do so. In the one view the driver might be regarded as working at the time in the business of the contractor, and in the other view as working in the business of the defendants. The control over the driver, depending as a legal right upon the determination of this question, would be decisive of the case. The court submitted this question to the jury under instructions which were surely as favorable as the defendants were entitled to. At defendants' request the court not only charged the jury that in order to justify a recovery they must find that the "driver of this hired vehicle was a servant of the defendants," and that "they must have control over him at the time of the accident itself," but further charged "that if the jury believe that the only authority or control exercised by the defendants over these hired vehicles was in relation to the collection of receipts for the delivery of fragile goods, and the naming of the route or bin from which the goods were to be taken, and the giving to the driver of a delivery sheet, then the defendants did not have such control or authority over the driver thereof as would make the defendants responsible for any negligence on the part of the driver of one of said hired trucks at the time in question," and also "that, if the jury believe that the control of the defendants over the drivers of these hired vehicles ceased after the vans left the store of the defendants for any given trip, then their verdict must be for the defendants." The recent decisions in this state seem to be uniform in the assertion that the true test as to whether the relation of master and servant exists is not necessarily the payment of wages, but is whether at the time of the injury complained of the alleged servant is engaged in the business of the alleged master, and subject to his direction and control. It is not so much the actual exercise of control which is regarded, as the right to exercise such control. In Wood, Mast. & S. § 281, it is said:

"In order to be held chargeable for the acts of another, the person sought to be charged must at least have the right to direct such person's conduct, and to prescribe the mode and manner of doing the work; and the person for whose acts he is sought to be charged must, at the time when the act complained of was done, not only have been acting for him, but also must have been authorized by him, either expressly or impliedly, to do the act."

In Laugher v. Pointer, 5 Barn. & C. 547, Littledale, J., laid down the rule that he is master who has the right of control over the person inflicting the injury at the time it was inflicted.

In Linnehan v. Rollins, 137 Mass. 125, among the instructions which the court sanctioned and approved was one to the effect that "the absolute test is not the exercise of the power of control, but the right to exercise power of control."

In Patten v. Rea, 40 Eng. Law & Eq. 329, the court say that, in an action for damages done by the negligent driving of the defendant's servant, the proper question to leave to the jury is whether at the time of the act complained of the servant was driving upon the master's business and with his authority. In that case the general manager of the defendant, a horse dealer, had a horse and gig of his own, which he used for the defendant's business as well as

his own, and in return the horse was kept at the defendant's expense; and on one occasion the manager, on putting the horse into the gig, told the defendant he was going to S. to collect a debt for him, and afterwards to see his own doctor, and before he got to S. he ran his gig against the plaintiff's horse and killed it. It was held that, although it did not appear that the defendant had expressly requested the servant to use the horse and gig on this particular occasion, yet there was sufficient evidence to charge him with liability for his act, because at the time he was on the defendant's business, with his knowledge and assent.

In Cunningham v. Improvement Co., 20 App. Div. 171, 46 N. Y. Supp. 954, the plaintiff, a teamster in the general employment of A., was directed by A. to perform such work as might be required of him by B., and in the course of the work was injured by the negligence of a servant in the general employment of B. The court said (page 176, 20 App. Div., and page 957, 46 N. Y. Supp.):

"The plaintiff at the time he received his injury was engaged in performing services for the defendant, who had the right and did actually assume to control his conduct. For any misconduct or inability to perform the service required of him, the defendant could undoubtedly have discharged him and returned him to his general employer. The defendant was therefore at that time the plaintiff's master, and, as he was also the master of the person whose negligence caused the injury, it follows that this person and the plaintiff were co-servants in the same common employment, and that no action lies against the defendant for the injury sustained by the plaintiff. Rozelle v. Rose, 3 App. Div. 132, 39 N. Y. Supp. 363."

In Wyllie v. Palmer, 137 N. Y. 248, 257, 33 N. E. 381, 19 L. R. A. 285, Judge O'Brien said:

"The fact that the party to whose wrongful or negligent act an injury may be traced was at the time in the general employment and pay of another person does not necessarily make the latter the master and responsible for his acts. The master is the person in whose business he is engaged at the time, and who has the right to control and direct his conduct. The rule on this subject is well stated by a learned author on the Law of Negligence as follows: 'He is to be deemed the master who has the supreme choice, control, and direction of the servant, and whose will the servant represents, not merely in the ultimate result of his work, but in all its details. The payment of an employé by the day, or the control and supervision of the work by the employer, though important considerations, are not in themselves decisive of the fact that the two are master and servant. * * * Servants who are employed and paid by one person may nevertheless be ad hoc the servants of another in a particular transaction, and that, too, where their general employer is interested in the work. They may, without consulting their master, but in good faith, assist a person independently employed to do something which shall benefit their master, but with which neither he nor they have any right to interfere, and in which they act entirely under the control of such other person. In none of these cases is the nominal master responsible to strangers for their acts or omissions.' Shear. & R. Neg. (4th Ed.) p. 269."

In that case the plaintiffs were injured during a display of fireworks in charge of a citizens' committee. The fireworks were sold and delivered by the defendants, who also sent a man and a boy to set them off, and the accident occurred through the negligence of the boy. Held that, as the display was in charge of the committee, the boy was acting at the time in their service, and not as the servant of the defendants.

In McInerney v. Canal Co., 151 N. Y. 411, 45 N. E. 848, it was held that the defendant's engine crew when running their engine upon a switch track upon the premises of a private shipper of freight, at the request of the shipper, to couple and move cars for him on his track, under his orders, for shipment on defendant's road, are in law his servants.

In Higgins v. Telegraph Co., 156 N. Y. 75, 78, 50 N. E. 500, Judge O'Brien said:

"The general rule is that a party injured by the negligence of another must seek his remedy against the person who caused the injury, and that such person alone is liable. The case of master and servant is an exception to the rule, and the negligence of the servant while acting within the scope of his employment is imputable to the master. Engel v. Eureka Club, 137 N. Y. 100, 32 N. E. 1052. But the doctrine of respondeat superior applies only when the relation of master and servant is shown to exist between the wrongdoer and the person sought to be charged for the result of the wrong, at the time and in respect to the very transaction out of which the injury arose. The fact that the party to whose wrongful or negligent act an injury may be traced was at the time in the general employment and pay of another person does not necessarily make the latter the master and responsible for his acts. The master is the person in whose business he is engaged at the time, and who has the right to control and direct his conduct. Servants who are employed and paid by one person may nevertheless be ad hoc the servants of another in a particular transaction, and that, too, when their general employer is interested in the work. Wyllie v. Palmer, 137 N. Y. 248, 33 N. E. 381, 19 L. R. A. 285."

And at page 79, 156 N. Y., and page 502, 50 N. E.:

"I am unable to distinguish this case in principle from the cases in this court already cited, and the best-considered cases in other jurisdictions are to the same effect. Murray v. Currie, L. R. 6 C. P. 26; Rourke v. Colliery Co., 2 C. P. Div. 205. In the latter case Lord Cockburn stated the rule in these words: 'But, when one person lends his servant to another for a particular employment, the servant, for anything done in that particular employment, must be dealt with as the servant of the man to whom he is lent, although he remains the general servant of the person who lent him.' The true test in such cases is to ascertain who directs the movements of the person committing the injury."

There is nothing in the case of Murray v. Dwight, 161 N. Y. 301, 55 N. E. 901, 48 L. R. A. 673, which in any degree conflicts with the principle established and affirmed in these cases. In that case the driver was pursuing what the court called "an independent and quasi public employment, in the nature of a common carrier." He was a truckman. It was he (the driver) who was injured. He was injured by the negligence of one of his customer's servants before he actually commenced the work for which he had been engaged, and the decision rests upon the proposition that a person engaged in the exercise of a recognized and independent public calling or occupation is not to be regarded as a co-servant with the servants of his patrons. Judge O'Brien said (page 305, 161 N. Y., and page 902, 55 N. E.):

"A servant is one who is employed to render personal services to his employer otherwise than in the pursuit of an independent calling. The truckman who transports the traveler's baggage or the merchant's goods to the railroad station, though hired and paid for the service by the owner of the baggage or the goods, is not the servant of the person who thus employs him. He

is exercising an independent and quasi public employment in the nature of a common carrier, and his customers, whether few or many, are not generally responsible for his negligent or wrongful acts, as they may be for those of other persons in their regular employment as servants. A contract, whether express or implied, under which such special jobs are done or such special services rendered, is not that of master and servant, within the law of negligence. Iron Works v. Hurlbut, 158 N. Y. 34, 52 N. E. 665; 1 Pars. Cont. 101–109."

In that case Judge Gray, who differed from his associates only in the application of the legal principles to the facts, said of the recent cases on the subject hereinbefore referred to (page 310, 161 N. Y., and page 904, 55 N. E.):

"If I read these cases right, they sustain the doctrine that one who is the servant of the general master may, if employed elsewhere temporarily, ad hoc, become the servant of the special master; and it is of no consequence whether he is loaned for the purpose, or whether he is hired, not directly, but through his general master. If the particular employment subjects him to the directions and orders of another than his general master, he ceases to be the latter's servant for the time."

The difference between Judge Gray and his associates arose from the fact that he refused to recognize the distinction in the case of one who is pursuing a known business or occupation, and who, although subject to the orders and directions of his patrons or customers, is not subject to them in the sense that a servant is subject to the orders and directions of his master. Murray was never transferred from one master to another, but was all the time working in the business of his general master, viz. the trucking business. His case is analogous to that of one who hires a horse and driver from a livery stable for a special service, and which service the driver renders in the livery business, and by virtue alone of his general employment. In rendering such service to a customer of the stable, he is doing the very thing for which he is hired generally by his master; and the case is not presented of a servant who is hired to do one thing for a general master, but who is temporarily transferred to do another thing for a special master.

Applying the principles of these cases to the one under consideration, it is apparent that the learned trial justice but followed the law in submitting the controversy to the jury. The decision of the case necessarily rests upon the question, whose servant was the driver at the time of the accident? And we must affirm the judgment unless we can say, as matter of law, that he was not the servant of the defendants. Prima facie, he was the servant of Abraham & Straus. He was certainly engaged at the time in delivering their goods in a wagon loaded at their store, and advertising their name to the general public. Notwithstanding these facts, the driver might have been delivering these goods for Abraham & Straus in the pursuit of some other independent occupation than theirs, such as that of truckman, liveryman, expressman, or forwarder; but the evidence fails to disclose that such was the case. The test to determine whose servant he was is to decide, in whose business was he driving? If not driving in the business carried on by the defendants, then in what business was he driving? For all that appears, he may never have drawn a rein until he did so on the occasion in question. It

is true that, if he were "furnished" to Abraham & Straus under one of the written contracts, it might be plausibly argued that his unknown master had taken a contract to deliver their goods for them, but such argument would surely not be so conclusive as to make the decision of the question one of law and not of fact. And, where the question as to the existence of the relation of master and servant is a mixed one of law and fact, it must be left to the jury. Brophy v. Bartlett, 108 N. Y. 632, 15 N. E. 368, reversing 37 Hun, 642. See memorandum filed by Judge Finch. The determination must still be reached in the light of the intent of the parties, and the beneficial end to be accomplished by the contract,—whether, in other words, the contractor was to make the deliveries, or whether his contract was fulfilled when he "furnished" the defendants with the means of making them, and guarantied the fidelity of the individuals whom he furnished. I concur in the view adopted by the jury. The proprietors of a large department house, with hundreds, perhaps thousands, of employés, and 70 vans for the carrying out of their contracts of sale and delivery, require 41 more vans to meet the increased holiday trade. They pick them up, with drivers and helpers, wherever they can, for the two weeks of rush. In most instances they require written guaranties of the care and fidelity of such temporary employés, but in other instances exact no such condition. They put their own names on the vans so hired, and use them, so far as can be seen, precisely like the ones they own. The essence of the contract requires that they should be allowed to do so. The practical object sought to be accomplished requires that they should be allowed to direct the drivers and helpers how to load, what to load, when to go, where to go, by what routes, and with what reasonable expedition. The defendants' superintendent frankly admits that the actual practice accorded with these requirements, and the only difference observable is that the temporary servants naturally required more instruction than the regular hands. Indeed, it would be difficult to imagine the defendants conducting their holiday trade with nine outside bosses managing the delivery of their goods. To say that under such circumstances the defendants would be responsible for the negligence on the public streets of their regular servants, but not for that of those thus temporarily hired, is so repugnant to reason and justice that it would be little short of amazing if it had yet found place in the adjudications of the state. It certainly finds no sanction in any authoritative case cited by the appellants' counsel, and those which make the payment of wages the sole test have long since been overruled. The judgment and order should be affirmed, with costs.

WOODWARD and JENKS, JJ., concur.

GOODRICH, P. J. (dissenting). I am constrained to differ from the views of my associates, as expressed in the opinion of Mr. Justice HIRSCHBERG. On Christmas eve, 1898, the plaintiff was crossing Livingston street at its intersection with Bond, in the borough of Brooklyn, when her foot was caught by a rope trailing along

the street from a two-horse truck. She was thrown to the ground, dragged some distance, and received serious injuries. The complaint alleged that the injury was occasioned by "one of the defendants' horses and trucks in charge of their servants," and the answer denied the allegation. The plaintiff and her witnesses described the truck as having on it a strip of canvas upon which was painted the defendants' firm name, Abraham & Straus. The defendants' evidence was sufficient to show that the firm owned many trucks, upon which its name was painted, but none which had upon it a canvas strip of the character described; that at the holiday season in question the firm hired from 11 different owners more than 40 trucks for the delivery of goods; and that such trucks had upon them canvas strips with the name of the firm painted thereon. The evidence was thus sufficient to show that the truck which caused the injury to the plaintiff was one of those hired, but there was no evidence to identify the particular truck or to show its ownership, as it appeared that the driver drove away without stopping at the time of the accident. The evidence showed that 30 of the hired trucks were engaged under a written contract which is set out in the prevailing opinion. The other 11 were subsequently hired from the same parties without any written contract, but I think it appears from the evidence, as the court below assumed, that they were hired on the same terms. There was evidence for the defendants, not contradicted, that they were proprietors of a large department store, and used bins, into which packages for different localities were deposited. Each bin represented a different route. Instructions were given to each driver of the hired trucks, to take a particular bin,— that is, to load his truck therefrom,—and no other instructions were given him by the defendants or their employés. The driver and helper packed the load. In each package was a slip or blank receipt containing the destination of the package, and it was the duty of the driver to take the package to such destination, have the receipt signed, and return it to the defendants' store. When goods were sent C. O. D., the cash represented was turned over by the driver to his own employer, who made return thereof to the defendants' cashier at the store. There was no evidence that the defendants assumed control of the method of loading the hired trucks, or of fastening the loads, or of having or using any ropes thereon, or of the method of driving or managing them while on their several routes. Indeed, the contrary appeared. It is evident from this statement that the defendants' responsibility must be predicated upon the contract between them and the owners of the hired trucks. There is nothing in the evidence to vary the obligation expressed in the written contract as to the management of the trucks, and the question is, whose servant was the driver at the time of the accident?

At the close of the plaintiff's evidence the defendants moved for a dismissal of the complaint upon the ground that it had not been established that the wagon in question was a wagon belonging to the defendants, and that it had not been shown that the driver was in their employ or control. This motion was renewed at the close

of the whole evidence, and also upon the further ground that it was affirmatively established that the truck was one of those hired by the defendants.

The evidence shows that the defendants made an independent contract with the owner of the truck for the use of the truck and team, with a driver and helper, for the delivery of their goods. In this business the driver and helper were the servants of the owner of the truck, and not the servants of the defendants. The defendants had no control over the truck or the driver and helper, so far as the driving or the method of taking the packages to their destination, or the general care of the truck and its equipment, was concerned, nor did they assume to exercise any. They did not hire or pay the driver or helper, and had no power to discharge them. For the negligence of such driver or helper in the performance of this independent contract, resulting in the accident, the defendants are not liable to the plaintiff.

In Blake v. Ferris, 5 N. Y. 48, the doctrine of respondeat superior was defined by reference to English cases, one of which was Quarman v. Burnett, 6 Mees. & W. 497, the reasoning of which was approved by the court of appeals. In that case the defendants owned a carriage, and hired a driver and a pair of horses from another person to draw the carriage for a short time, during which an injury was done to the plaintiffs' property by the carelessness of the driver. The court denied a motion to nonsuit. The ground of the decision was that the master only is responsible for the acts of the servant, and that there can be but one responsible superior for the same subordinate at the same time and in respect to the same transaction. The court of appeals approved the remarks of Judge Story in his work on Agency (§§ 453a, 453b), where he says that the better opinion is that in such cases the driver is to be treated as the servant of the stable keeper, notwithstanding his temporary hiring, and that he cannot be deemed at the same time the servant of both stable keeper and the hirer. Judge Story said:

"Nice questions have arisen as to when and under what circumstances the parties employed are to be deemed servants or subagents of the principal employer, and when only the subagents of the immediate person by whom they are actually employed. In the first case the principal employer is liable, and in the latter not."

In Michael v. Stanton, 3 Hun, 462, a master sent his team to work for the defendant, and while doing such work the servant negligently drove the wagon against that of the plaintiff. It was held that no cause of action existed against the defendant, as "the defendant did not employ Hinckley [the servant], and had not the power to discharge him. This is the only test by which to determine which is the master, and as such liable to the person injured." It is to be noticed that this case is cited as authority in the opinion of Mr. Justice Merwin in Murray v. Dwight, infra, to which, on appeal, the court of appeals referred in terms of highest praise.

In Gerlach v. Edelmeyer, 47 N. Y. Super. Ct. 293, affirmed without opinion in 88 N. Y. 645, it was said:

"Dittmer, through whose negligence the accident happened, was the defendants' servant,—paid by and controlled by them. They hired him. They

67 N.Y.S.—69

could discharge him. This is the true test by which to determine who is master, and consequently who is liable to the party injured."

In Sanford v. Oil Co., 118 N. Y. 571, 24 N. E. 313, the plaintiff was an employé of a firm of stevedores engaged to load a ship with barrels of petroleum which were on the dock of the defendant; the latter agreeing to furnish the engine and apparatus for hoisting and lowering the barrels, and the necessary men to run and manage it. The plaintiff's duty was to stand at the gangway and signal to Gebhard, one of the persons employed by the defendant to manage the hoisting and lowering of the barrels. Gebhard raised a barrel without any signal, in consequence of which the plaintiff was injured. The case turned upon the question whose servant Gebhard was. The court held that he was not the servant of the stevedores, but of the Standard Oil Company.

In Butler v. Townsend, 126 N. Y. 105, 26 N. E. 1017, it was said by Judge Finch (page 108, 126 N. Y., and page 1018, 26 N. E.):

"One may be employed without being a servant, and have an employer who is nevertheless not the master. King v. Railroad Co., 66 N. Y. 181. The relation exists where the employer selects the workman, may remove or discharge him for misconduct, and may order not only what work shall be done, but the mode and manner of performance. Blake v. Ferris, 5 N. Y. 48; Town of Pierrepont v. Loveless, 72 N. Y. 214."

In King v. Railroad Co., supra, it was said (page 184, 66 N. Y.):

"It is not enough, in order to establish a liability of one person for the negligence of another, to show that the person whose negligence caused the injury was at the time acting under an employment by the person who is sought to be charged. It must be shown in addition that the employment created the relation of master and servant between them."

, This was quoted in Hexamer v. Webb, 101 N. Y. 377, 4 N. E. 755, and both cases cited with approval in Murray v. Dwight, 15 App. Div. 241, 44 N. Y. Supp. 234, affirmed in 161 N. Y. 301, 55 N. E. 901. It was held that the mere fact that one renders some service to another for compensation, express or implied, does not necessarily create the legal relation of master and servant; that a servant is one who is employed to render personal service to his employer otherwise than in the pursuit of an independent calling.

Murray v. Dwight, supra, contains an analysis of previous decisions of the court of appeals upon the question here involved. The court (O'Brien, J., writing) said (pages 305, 306, 161 N. Y., and page 902, 55 N. E.):

"The relation of master and servant is often confused with some other relation. The mere fact that one person renders some service to another for compensation, expressed or implied, does not necessarily create the legal relation of master and servant. There are many kinds of employment which are peculiar and special, where one person may render service to another without becoming his servant in the legal sense. A servant is one who is employed to render personal services to his employer otherwise than in the pursuit of an independent calling. The truckman who transports the traveler's baggage or the merchant's goods to the railroad station, though hired and paid for the service by the owner of the baggage or the goods, is not the servant of the person who thus employs him. He is exercising an independent and quasi public employment in the nature of a common carrier, and his customers, whether few or many, are not generally responsible for his negligent or wrongful acts, as they may be for those of other persons

in their regular employment as servants. A contract, whether express or implied, under which such special jobs are done or such special services rendered, is not that of master and servant, within the law of negligence."

Anderson v. Boyer, 156 N. Y. 93, 50 N. E. 976, is cited by the plaintiff as authority in the case at bar. I cannot so regard it, and I think the court made the same distinction which I have attempted to point out. In that case Boyer, the owner of a lighter, by charter to one Schoenewolf gave him possession and absolute control of the boat, with its captain and mate, until the charterer should finish the work for which he chartered the lighter. A third person, the plaintiff, was injured through the negligence of the captain in unloading; and the court held that the captain was the servant of the charterer, and not of the owner, and that this negligence was not chargeable to the owner, who, being under no obligation to unload the vessel, had not in fact attempted to interfere with it. But the court expressed no opinion as to the liability of Boyer, the owner, for negligence in the navigation of the vessel. Chief Judge Parker, writing, said (page 103, 156 N. Y., and page 979, 50 N. E.):

"It may well be that the captain still owed to these defendants the duty of navigating the vessel carefully; but that Schoenewolf, under this contract, had the right to retain the possession and control of her so long as it should be necessary to move the materials which he had chartered her to move is beyond question, and it is equally true that during such time he had the right to control both the captain and the mate in loading and unloading the vessel. If more than two men had been needed, either to load or unload, Schoenewolf, and not the defendant, would have had to employ them. As matter of fact, more men were required and were employed by Schoenewolf, the charterer; and certainly nowhere in the contract, as testified to, can there be found a basis for charging that the defendant had anything whatever to do with the loading or unloading of this boat, or the right to control it."

The analogy to the case at bar seems very apparent. In the driving of the horses the driver owed a duty to, and was the servant of, his employer, just as the master of the lighter owed the owners the duty of navigating it. With this Schoenewolf had not interfered. But Schoenewolf, as charterer, was in charge of and directing the unloading of the lighter, and hired other and additional men for that purpose, and was held liable on the ground that he was in charge of and directing the work. No such thing occurred in the case at bar. The defendants made an independent contract with the owner of the truck, who was to furnish a driver and helper. The defendants simply instructed the persons furnished by the owner of the truck to perform the business of the contract, and did not interfere with the method of doing it. They did not employ or pay the men, and were under no contract, express or implied, to do so. They had no power to discharge them. They gave no directions as to the method in which the team and truck should be driven or managed. In the performance of that work the driver and helper were the agents of the owner of the truck, by whom they were employed and paid. They could not be at the same time the servants of the defendants and of their own employer, and for their negligence the defendants are not responsible.

In Sullivan v. Dunham, 35 App. Div. 342, 347, 349, 54 N. Y. Supp. 962, Mr. Justice Hatch pointed out the distinction which I have endeavored to make. He said: .

"The learned counsel for the defendant Dunham claims that the supreme test is: 'Did the agreement provide for a result to be accomplished by the employé, and did it leave to the employé the means and method by which that result was to be accomplished? If it did, then the relation is that of employer and contractor, and not that of master and servant.' We accede to this view of the law, and it is in accord with the authorities upon this subject. Hexamer v. Webb, 101 N. Y. 377, 4 N. E. 755; Butler v. Townsend, 126 N. Y. 105, 26 N. E. 1017; Herrington v. Village of Lansingburgh, 110 N. Y. 145, 17 N. E. 728. * * * The contention of the plaintiff that liability attaches even though the relation be that of independent contractor cannot be sustained. Such a rule does not apply unless the work itself creates the injury. Downey v. Low, 22 App. Div. 460, 48 N. Y. Supp. 207. In the present case it is quite clear that the injury arose, not from the work done, but from the method adopted in doing it."

And in Weber v. Railway Co., 20 App. Div. 292, 295, 47 N. Y. Supp. 7, 8, the court said:

"In the present case the relation of master and servant did not exist between the company and the contractor, but the true relation was that of principal and contractor. It is true that the company had the right of superintending and supervising, by its agents, the execution of the work, and giving directions in relation thereto; but the decisions show that these circumstances do not of themselves render a principal liable for the negligent act of the contractor, unless it was brought about by the order of the principal."

So, in Vogel v. Mayor, 92 N. Y. 10 (Judge Earl writing), the court cited various precedents (among them, Pack v. Mayor, 8 N. Y. 222, and Kelly v. Mayor, 11 N. Y. 432), and said (page 18):

"In Pack v. Mayor the city had made a contract with a person to grade a street, and the damage complained of was done by the carelessness of a subcontractor in blasting rock. It was held that the person actually guilty of the careless act was liable for the damage, and that the city was not liable, as it had no control over the workmen of the contractor,—could not dismiss them, or direct the manner in which the blasting should be done. In reference to a clause in the contract in that case which bound the contractor to conform the work to such further directions as might be given by the city or its officers, the court held, as stated in the headnote, 'It gives to the corporation power to direct as to the results of the work, but without control over the contractor or his workman as to the manner of performing it, which control alone furnishes a ground for holding the master or principal liable for the act of the servant or agent.' But the plain inference is that the city in such a case is liable for the consequences of operations which are subject to its control. The case of Kelly v. Mayor was similar to the case of Pack v. Mayor, and was disposed of upon precisely the same principles. The doctrine was again announced that to make the city liable it must have the power to direct and control the manner of performing the very work in which the carelessness occurred."

I think that the doctrine thus stated destroys the force of the argument of the learned counsel for the plaintiff that, because the defendants directed the doing of the work of the contract, they rendered themselves liable for the method in which it was performed.

In addition to this, there seems to have been error in the admission of evidence. Parr, superintendent of delivery of goods for the defendants, testified to the contracts for the hiring of the trucks or vans, and that they had strips of canvas upon them with the firm

name painted thereon. The following occurred on the cross-examination by Mr. Patterson, plaintiff's counsel:

"Q. Why did you furnish these strips with 'Abraham & Straus' on for these wagons? A. For the purpose of advertisement. Q. For the purpose of advertising that they were your wagons? Mr. Bouvier: I submit that that is a conclusion. The Court: If the witness adopts it, it will help the plaintiff. Mr. Bouvier: I take an objection to the question on the ground that it involves a conclusion for the witness. (Objection overruled. Defendant excepts.) A. Yes; I guess so. Q. What? A. Yes, sir. Q. Then you regarded them as your wagons for the purpose of these deliveries, didn't you? Mr. Bouvier: The same objection, as a conclusion put in the mouth of the witness, and not binding upon the defendant. (Objection overruled. Defendant excepts.) A. Yes, sir. * * * By the Court: Q. What duty has the driver about them when he comes to deliver that particular package? A. He takes this receipt, delivers his goods, and gets his receipt signed. Q. And brings it back to you? A. Brings it back to the house. By Mr. Patterson: Q. That he was doing for you, wasn't he? A. For Abraham & Straus; yes, sir. Q. He was to do it for Abraham & Straus, and he was to do it under their direction, wasn't he? A. Yes, sir. Q. He was delivering all these goods for Abraham & Straus, wasn't he,—all the goods he had in the wagon? A. Yes, sir. Q. And Abraham & Straus were having that man do their work, weren't they,—each of these drivers on a hired wagon? (Objected to as calling for a conclusion, and not binding upon the defendant. Objection overruled. Defendant excepts.) A. Yes, sir. * * * Q. Belford [one of the contractors] is obliged to do what you say? A. Yes, sir. Q. Belford himself is under your control, isn't he? (Objected to as calling for a conclusion, and not binding upon the defendant. Objection overruled. Defendant excepts.) Q. Belford himself is under your control, isn't he? A. Yes. Q. And he is obliged to give you the use of that van and that man for what things you want done, isn't he? (Same objection. Objection overruled. Defendant excepts.) Q. Isn't that right? A. Yes, sir. Q. And you controlled both Belford and the van and the man, didn't you, at this time? (Same objection. Objection overruled. Defendant excepts.) A. Yes, sir. * * * Q. Isn't it a fact that you regarded these trucks as your trucks for the purpose of this work? (Objected to as calling for a conclusion, and not binding upon the defendant. Objection overruled. Defendant excepts.) A. We certainly used the trucks for our delivery purposes. Q. You used them? A. Yes, sir. Q. That is, Abraham & Straus used them? A. Yes, sir. Q. And Abraham & Straus controlled them while they were in the course of delivery, didn't they? (Same objection. Objection overruled. Defendant excepts.) A. Yes, sir. Q. And controlled the men on them? A. Yes, sir. Redirect Examination by Mr. Bouvier: Q. What do you mean by saying 'controlled the men on them'? After they had left your establishment, what, if any, control did you have over those men? A. None. Q. Therefore after they left your establishment you had no control over them? A. No, sir. Mr. Patterson: I object to this, as leading. (Objection overruled.) Q. What did you mean by saying that you had control over the principals of these contracts? A. As I understand it, I understood it then that we hired these vans to do our business. They were to furnish them. We placed them wherever the business demanded. Q. Was that what you meant by 'control'? A. Yes, sir. Q. Were there any other terms prescribed in respect of the use of these wagons than those prescribed in the contract put in evidence? A. No, sir. Q. Now, did you ever, or did any of your subordinates ever, direct any driver as to what streets he should take or what course he should pursue in respect of the parcels he got from any one bin? A. Not to my knowledge. Q. Did you ever hear anybody do it? A. No, sir. Q. In the employ of Abraham & Straus. Did you ever do it yourself? A. No, sir; I never did."

The remark of the learned trial justice, above quoted, "If the witness adopts it [the conclusion] it will help the plaintiff," was eminently true, and there can be no question that such was its effect.

But the evidence was a mere conclusion of the witness, and was inadmissible. It was not a statement of any fact. In Miller v. Railroad Co., 71 N. Y. 380, where the question arose as to the person in possession of lands, the court said (page 385):

"The same witnesses were allowed, against objection that it was incompetent, to testify generally that they were in possession of the lands. I am inclined to think that in the case of uninclosed, unoccupied woodland, it is incompetent to ask a witness whether he was in possession of the land. The peculiar facts should be shown which in law in such case constitute possession. But if the witness should, to such a question, answer that he was in possession, it would prove nothing, if the facts also testified to showed that he was not in possession."

This case was cited with approval in Arents v. Railroad Co., 156 N. Y. 1, 50 N. E. 422, where a witness was asked, "Who was in possession of this farm?" The court said (page 9, 156 N. Y., and page 424, 50 N. E.):

"It was excluded, and an exception was taken. The referee had been careful to admit in evidence all the acts of the parties tending to show possession. He had permitted evidence to be given showing whether the premises were fenced, when and how cultivated, and what was done upon the land from time to time. The question as to whether the witness was in possession was a conclusion of law to be drawn from the facts. The ruling was proper."

Mr. Abbott, in his Trial Evidence (2d Ed.) p. 53, says:

"The declarations of the officer or agent cannot suffice to show the existence or scope of his authority, but he may be called as a witness to prove it. If implied authority is essential to the cause of action, he should be required to state the facts relied on as raising implied authority, and should not be asked whether or not he had authority to do the act in question, for this is asking for a conclusion."

In the cases cited the court held that the facts indicating possession must be proved. In the case at bar the vital question for the jury to decide was whether the defendants controlled the vans and drivers, and this was one of the questions properly submitted to the jury. It was error to permit the witness to testify to a conclusion which invaded the province of the jury. The plaintiff's counsel contends, however, that the defendants' counsel opened the door to this kind of testimony when he inquired of Parr on direct examination:

"Q. Have you or did you have at that time, in the possession of, or under the ownership or control of, the defendant, any vehicle for the delivery of goods or wares that had such a dirty-white canvas as described? A. No, sir."

But the difficulty is that it was the plaintiff who introduced evidence "opening the door" to conclusions as to these trucks with dirty canvas:

"By Defendants' Counsel: Q. I understood you to say that this was a white canvas truck? A. It looked sort of a gray canvas. Q. That is, a dirty white? A. Yes, sir. Redirect Examination by Mr. Patterson: Q. You know that is the kind of truck Abraham & Straus— (Objected to as calling for a conclusion.) The Court: The question has not been completed. Q. Have you seen exactly that sort of truck loading up at Abraham & Straus' stores? (Objected to as calling for a comparison and for a conclusion.) The Court: Fix the time. Q. About that time? Mr. Bouvier: And it is further objected to as asking the witness to institute a comparison between

the truck now described in evidence and one that is not in evidence, and calling for a conclusion of the witness. (Objection overruled. Defendant excepts.) Q. Have you seen exactly that sort of truck? (Same objection. Objection overruled. Defendant excepts.) Q. About that time? A. Yes, sir. Q. Many of them? A. Yes, sir. Mr. Bouvier: I make the same objection as before. (Objection overruled. Defendant excepts.) Q. Where have you seen them being loaded up? (Same objection. Objection overruled. Defendant excepts.) A. On Livingston street. Q. At what store? (Same objection. Objection overruled. Defendant excepts.) A. Abraham & Straus."

The question of the defendants' counsel evidently related to the testimony last quoted, and was properly admitted to contradict it.

For these reasons, I think that the judgment and order should be reversed.