ANTONIO DE PERRI, Respondent, *v.* MOTOR HAULAGE COM-PANY, INC., Appellant, Impleaded with RALPH H. MAT-THIESSEN, Doing Business under the Trade Name of MOTOR HAULAGE COMPANY, Defendant.

First Department, December 13, 1918.

**Master and servant — negligence — when chauffeur of one master operating motor truck being used by another under contract becomes the servant ad hoc of the latter — evidence — when act of chauffeur not malicious.**

In an action for negligence it appeared that the plaintiff was injured while riding upon a motor truck owned by the defendant and operated by a man in its general employment; that the defendant had under a written agreement furnished to a firm of road contractors several trucks together with drivers, supplies, etc., for hauling materials; that the defendant after notice that the trucks were being used by the contractors to carry their employees during a street car strike, instructed its drivers not to haul any more men on the trucks unless the superintendent of the contractors gave specific orders; that the driver of the truck in question was con-trolled exclusively by the contractors; that while the plaintiff, an employee of the contractors, was riding with the chauffeur on one of the trucks on its way from the job to the garage, the body of the truck hoisted and the cable of the mechanism rolled up catching plaintiff's hands, and that the apparatus must have been set in operation by the chauffeur pulling the lever in front of the seat.

Evidence *held* to establish that when the accident happened the chauffeur was engaged in the work of the contractors, subject to their direction and control, and that he was their servant *ad hoc* and not employed doing the work of the defendant or under its control or direction.

The verdict of the jury in favor of the plaintiff was contrary to and against the weight of the evidence.

As there was more than one lever in front of the driver's seat the jury were warranted in finding that he carelessly pulled the wrong lever, and hence it cannot be held that the act of the chauffeur was purely malicious and had no relation to the operation of the truck.

APPEAL by the defendant, Motor Haulage Company, Inc., from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 13th day of June, 1918, upon the verdict of a jury for $1,500, and also from an order entered in said clerk's office on the 11th day of June, 1918, denying defendant's motion for a new trial made upon the minutes.

*James A. Gray* of counsel [*William Dike Reed*, attorney], for the appellant.

*Edgar J. Treacy*, for the respondent.

SHEARN, J.:

The plaintiff was injured while riding upon a motor truck owned by the defendants and operated by a man who was in their general employment but who, at the time of the accident, according to the contention of the defendants, was the servant *ad hoc* of Warren Brothers, Inc., whose work he was doing, the truck being one of several which, together with chauffeurs, were furnished to Warren Brothers, Inc., under a written contract. Warren Brothers, Inc., was engaged in road construction on North Broadway, near Yonkers. The contract was as follows:

" Ralph H. Matthiessen, Clinton Brettell, M. D.
" THE MOTOR HAULAGE COMPANY,
" 7 East 42nd Street,
" Transit Building.
" Special Transportation Problems,
" Yearly Haulage Contracts.
" Telephone, Vanderbilt 981.

                              " NEW YORK CITY, *Aug.* 1, 1916.
" WARREN BROTHERS COMPANY,
          " Saunders Dock,
                    Yonkers, New York:

" GENTLEMEN.— In accordance with request of your Mr. C. O. Warren, we herewith submit agreement made today, for

hauling materials from your plant at Saunders Dock in Yonkers, to job on North Broadway.

" We will furnish sufficient five-ton trucks to carry on your work, together with drivers, gasoline and oil for the sum of $27.00 per day of nine hours; all overtime to be charged at the rate of $3.00 per hour.

" It is understood that in the event of truck being laid off for any reason other than break down of the truck itself, we are to be paid for one-half day provided the truck has worked one-half day or less, and for a full day provided the truck has worked after the noon hour. It is further understood that any loss of time due to break down of the truck will be deducted from our bill.

" Our understanding is that the work is to commence about the 10th of August, and we would ask that you give us four or five days' notice so that we can have the trucks ready when you need them.

" Trusting that the above agreement is satisfactory to you, and asking that you sign one copy and return for our files, we are

· " Yours very truly,
          " THE MOTOR HAULAGE CO.
                    " Per R. H. MATTHIESSEN.
          " Signed and Accepted
          " Date
       " WARREN BROTHERS CO.
                    " Per C. O. WARREN, *Supt.*"

In pursuance of such agreement the defendants sent five five-ton trucks, with drivers instructed to report to Mr. C. O. Warren at the asphalt plant of Warren Brothers, Inc., in Yonkers, to take their orders from him and do what he told them. The driver of the motor truck upon which the accident happened reported at said plant, and upon instructions received there proceeded to Saunders dock, where men employed by Warren Brothers, Inc., loaded the truck with asphalt, and the driver, by direction of the plant foreman, transported the asphalt to the site of the job on North Broadway, where he reported to the street foreman of Warren Brothers, Inc., and was directed by him to go to the center of the road and dump

the asphalt, which he did. This course of procedure was followed for several weeks, except that, when instructed by Mr. Warren, the truck was used to " go to the freight yard and get cement, take tools up to the job." The other trucks were similarly used indiscriminately, not only for hauling materials from the plant of Warren Brothers, Inc., at Saunders dock to the job, but for doing other work of Warren Brothers, Inc., connected with the job. The driver of one of the other trucks testified that " Whenever he [Mr. Warren] met us on the street or in the plant, if he wanted certain things to be removed and taken to different places, he would give us instructions to take them. * * * He gave us instructions to cart tools, and sand and men, and different things. Q. When did he give you instructions to cart sand? A. In between loads, and after carting asphalt, it all depends upon where he told us to go." The trucks were left at night in a garage on Warburton avenue, Yonkers. The garage did not belong to Warren Brothers, Inc. During the continuance of the work, there was a strike in Yonkers and the trolley cars were not running, and, at the conclusion of the day's work, laborers employed by Warren Brothers, Inc., in their work were sometimes permitted to ride on this truck into Yonkers. Whether this custom originated in orders, or whether the driver simply permitted the men to ride, does not appear. It does appear, however, that after the custom came to the notice of the defendants, the drivers were instructed by the defendants not to haul any more men on the trucks unless Mr. Warren gave specific orders for them to do so. After the receipt of these instructions, the driver of the truck in question notified Mr. Warren of such instructions. He testified that Mr. Warren said: " Go ahead and cart the men during the car strike." This was corroborated by the testimony of another driver. Mr. Warren, called as a witness by the plaintiff, admitted the notification, but testified: " I told them that I did not want to be put in the position of giving specific orders to that effect, but during the railroad strike, when men would otherwise have to walk about three miles, I thought it would be a very nice thing for them to do." The plaintiff testified that after finishing work at about five o'clock in the afternoon, he, in company with a number of

First Department, December, 1918.    [Vol. 185.

other workmen, got upon the truck to ride to Yonkers. No one directed him to do so but he had ridden with the chauffeur several times before. He denied that his " boss " had told him to ride on the truck at any time, but subsequently admitted that on a previous trial he had testified " that in the beginning when the strike began, the bosses had said for us to ride on this truck, but not that afternoon."

At this point the nature of the accident may well be noticed. The truck had a hoisting mechanism by which the body of the truck might be lifted and dumped. The hoisting apparatus was operated by a lever controlled by the chauffeur. The plaintiff stood immediately behind the driver's seat and with either hand caught hold of the hoisting cables at a point about one and one-half inches under the point where the cable met a wheel. After the truck had proceeded about a block and a half on its return journey from the job to the Yonkers garage, the body of the truck hoisted, the cable rolled up and each of plaintiff's hands was caught between the wheel and the cable, causing the injuries complained of. The testimony as to the cause of the hoisting, which was entirely independent of the ordinary operation of the motor truck, is not very clear, but the jury were warranted in finding that the chauffeur, without any reason for so doing, reached down and pulled the lever that controlled the hoisting apparatus and thus set it in operation.

Various grounds of negligence were alleged. It was first alleged that the plaintiff was a passenger upon a motor truck used by the defendants in the business of common carrier under the written agreement above set forth. This claim obviously had no foundation whatever. It was alleged that the machinery of the truck was in a defective and dangerous condition, but as to this no evidence was introduced. It was alleged that the motor truck was driven at an illegal rate of speed, but this claim was abandoned. The court instructed the jury: " The only negligence which you can find on the part of this chauffeur, if you find that was a negligent act, is the claim that he moved this lever while the automobile was in motion, and in that way caused the accident." The court further charged the jury, and properly, that if they found that the chauffeur moved the lever purely

out of malice and without any proper relation to the running of the automobile they must find a verdict for the defendant. The court also submitted to the jury, with clear and adequate instructions, the question whether or not at the time of the accident the chauffeur was the servant *ad hoc* of Warren Brothers, Inc. The main controversy upon this appeal concerns this issue.

The appellant insists that the court should have construed the contract and held as a matter of law that the defendants were not independent contractors but that the chauffeur was engaged in the work of Warren Brothers, Inc. We do not agree with this contention. The contract was susceptible of either construction and the course of dealing under it is a helpful guide in reaching a correct conclusion. (*Baldwin* v. *Abraham*, 57 App. Div. 67; affd., 171 N. Y. 677; *Howard* v. *Ludwig*, Id. 507; *Kellogg* v. *Church Charity Foundation*, 203 id. 191; *Di Salvo* v. *Larkin & Son, Inc.*, 83 Misc. Rep. 111.)

Examining the evidence, however, we are of the opinion that it was clearly established that when the accident happened the chauffeur was engaged in the work of Warren Brothers, Inc., subject to their direction and control, that he was their servant *ad hoc* and not employed doing the work of the defendants or under their control or direction. In the first place, it is apparent that the defendants made no contract to haul the employees of Warren Brothers, Inc., from their jobs to their homes or to any other place. *Second*, while the descriptive introductory clause of the contract is susceptible of the interpretation that the agreement was for hauling materials from dock to job, which, however, is not in accord with the actual agreement to " furnish sufficient five-ton trucks to carry on your work," the acts of the parties under the contract plainly show that they construed it as one to furnish trucks and men to be used by Warren Brothers, Inc., on and in connection with their work and solely according to their orders and subject to their control and direction. On this head, the testimony is uncontradicted. The use of the trucks, whenever so ordered by Warren Brothers, Inc., to go to the freight yard and transport tools to the job and similarly to go there for cement, and to do everything that Mr. Warren told them to do, is wholly inconsistent with the plaintiff's

claim that the defendants, as independent contractors, had merely undertaken for hire to transport materials from Saunders dock to the job. Furthermore, the paragraph of the contract providing that the defendants were to be paid whether the trucks were in use or not is strong evidence against the plaintiff's construction of the contract. Finally, no control over the driver was exercised by any one except Warren Brothers, Inc. Plaintiff seeks to find some evidence of control in the fact that instructions were given by defendants not to permit the men to ride on the trucks except under the specific instructions of Warren Brothers, Inc. This referred to the hauling of the men to Yonkers after the day's work was done. This was obviously for the purpose of avoiding any claim, in case of accident, that the defendants had acquiesced in a good-natured invitation of the chauffeur extended to the employees of Warren Brothers, Inc., and rather emphasizes the understanding of the defendants that the drivers were and should remain subject to the orders of Warren Brothers, Inc. Assuming that the contract was for the transportation of materials from the dock to the job, certainly a hauling of these men from the job to Yonkers after their day's work was finished was no part of the work of the defendants and was not anything in which they were interested. On the contrary, it was directly in the interest of Warren Brothers, Inc., serving as it did to accommodate and keep contented their employees who otherwise, because of the trolley strike, would have been obliged to walk from the job to Yonkers. Neither does it make any controlling difference that the accident happened while the motor truck was on the usual route from the job to the garage. It is not the route that is important but whose work was then being done. (See *Clawson* v. *Pierce-Arrow Motor Car Co.*, 182 App. Div. 172.) We are, therefore, of the opinion that the case falls within the principle of such cases as *Hartell* v. *Simonson & Son Co.* (218 N. Y. 345) and *McNamara* v. *Leipzig* (180 App. Div. 515), and that the verdict of the jury was contrary to the evidence and palpably against its weight.

The appellant contends that the complaint should be dismissed because the evidence clearly establishes that the act of the chauffeur was purely malicious and had no relation

to the operation of the truck. But there was more than one lever in front of the driver's seat and the jury were warranted in finding that the chauffeur carelessly pulled the wrong lever.

The judgment should be reversed and a new trial ordered, with costs to appellant to abide the event.

CLARKE, P. J., DOWLING, SMITH and MERRELL, JJ., concurred.

Judgment and order reversed and new trial ordered, with costs to appellant to abide event.