Lewis Irolla, Plaintiff, *v.* The City of New York and Another, Defendants.

Municipal Court of New York, Borough of Queens, First District, June 3, 1935.

*Edward A. Coleman,* for the plaintiff.

*Paul Windels* [*Jacob C. Lefkowitz* of counsel], for the defendant City of New York.

*John Holley Clark, Jr.,* for the defendant Mapes.

Pette, J.   The facts are these: On December 29, 1933, plaintiff operated his truck along Northern boulevard, Queens borough. It came in collision with a passenger car owned by the city of New York, and at the time driven by the codefendant, Mapes. The city's car had been regularly assigned to be used by Mr. Fred Sasse, an official of the city government, to wit, secretary of the borough of Queens. At the time of the accident Mr. Sasse was not in the car, but certain members of his family were in it, on their way from their home to attend the second installation of Mr. Sasse

as such official, following President Harvey's second election to office. It had been snowing lightly, the pavement was wet and icy. Northern boulevard is a much-traveled thoroughfare and is equipped with traffic signal lights. As a result of the accident the plaintiff's truck was damaged and the occupants of the city's car were severely injured.

The defendant Mapes was a licensed chauffeur. He was driving the car as an emergency relief worker, namely, a worker under the civil works administration, a Federal institution created by proclamation of the President of the United States. Mr. Mapes had been allocated to the office of the borough president and in turn assigned to the highway bureau. His pay came directly from the C. W. A. agency, and no part of it was contributed by either the State or city government. Due to the illness of the borough secretary's regular chauffeur, that official, for several weeks prior to the accident, had obtained the services of Mapes, issuing all instructions to Mapes in the operation of the car. It is undisputed that at the time of the accident Mapes was under the orders of the borough secretary, who that morning had gone to his office by subway because the car, which was stored at his home, was frozen. Mr. Sasse directed Mapes to have the car towed to the city garage in Flushing and that after the car had been thawed out, Mapes was to telephone Mr. Sasse for further instructions. When Mapes telephoned, Mr. Sasse told him to take the car to the office, but to stop on the way and pick up Mrs. Sasse, and convey her to borough hall. The chauffeur did so, and with Mrs. Sasse there went his son and mother-in-law. The unfortunate accident occurred on the way to borough hall. There is no question but that Mr. Sasse believed, in good faith, that he had a right to have the car transport members of his family to his office as had been done before. It is to be noted, as of some moment, that there is a discrepancy in the testimony of Mr. Sasse and that of Mr. Mapes as to the exact purpose of driving the car to borough hall. Mr. Sasse testified that the chauffeur was going to drive the car to the office " any way," and that the picking up of his relatives was merely incidental to the journey. The testimony of Mr. Mapes is a little different, in that he says that Mr. Sasse told him that after the car had been thawed out, to go to pick up Mrs. Sasse. While there is no contradiction of Sasse's testimony that the car would have been driven to the office " any way," yet, and although the question is not free from doubt, I lean to the view that the main, if not the only purpose for which the car started to go to borough hall was to take Mrs. Sasse there. It could be that the car was to be used later in the day to drive the secretary about on

official business, or back home, but there is no such evidence in this record.

The plaintiff has joined the city of New York as defendant upon the theory that the driver of the city's car, although a C. W. A. worker and paid with Federal funds, was nevertheless a servant of the municipality, making the rule of *respondeat superior* applicable; but that at any rate, under the recently enacted statutes, section 59 of the Vehicle and Traffic Law and section 282-g of the Highway Law, the city's liability rests upon the fact that its car was being operated by Mapes with the city's permission, through its official, the borough secretary, regardless of whether Mapes was acting within the scope of his employment at the time of the collision.

The defendant city, pointing out that this case involves the novel question of whether the city may be liable for the negligence of a C. W. A. worker, stresses the argument that the city is not chargeable with Mapes' negligence, upon the ground that there is no master and servant relationship between them, for the reason that Mapes was not an " employee " of the city, in that he was paid by the Federal government and was doing " made work," that is, work provided by the various local governments in a well-organized plan having for its ultimate objective the prevention of social unrest due to the widespread economic depression. The city, therefore, claims that a C. W. A. worker is to be considered not as an employee or agent, but rather as a " ward of the municipality which is required to support him with a helping hand for the relief of indigent persons." In addition, the city forcefully contends that Mapes was not acting within the scope of his duties at the time of the occurrence; and that his taking the secretary's family in the car was an *ultra vires* act, beyond the corporate powers, resulting in the city being absolved from liability for Mapes' negligence, even though he be held to be an employee, and that the statutes cited by plaintiff do not operate to change the rule.

The defendant Mapes claims that the accident took place through plaintiff's own negligence.

The learned corporation counsel points out that there are many pending cases of similar character in this and other cities of this State, as well as in other jurisdictions, and that the question of paramount importance is whether a municipality is liable for the tortious acts of a C. W. A. worker.

Although the question of negligence is a close one, in the light of the rule that the burden is upon the plaintiff and after observing and listening to the witnesses on both sides, I am satisfied that the weight of evidence negatives the existence of any negligence on the part of Mapes, and on the contrary, establishes that the

accident was unavoidable. There would be no occasion for this opinion, therefore, were it not for counsel's request for a judicial pronouncement on the main proposition involved, which naturally suggests three inquiries:

*First.* Is a C. W. A. worker paid by Federal funds, but engaged on city business, so far the employee of the city as to render it answerable for his negligent act at common law?

*Second.* If the first question be answered in the negative, do sections 59 of the Vehicle and Traffic Law and 282-g of the Highway Law change the rule so as to make the negligence imputable to the city, so long as the car was being operated with the city's permission through its officer, the secretary of the borough.

*Third.* If the negligence be attributable to the city, in either case, does the fact, if it be a fact, that the driver acted outside the course and scope of his employment, so as to render it an *ultra vires* act, release the city of liability?

The determination of the above propositions necessarily rests upon the preliminary question of the existence of the relationship of master and servant between the city and the driver. The basic element is: Whose work was he doing at the time of the accident? I shall treat the subject the same as if negligence on the part of the driver had been established.

The ownership by the city of the automobile driven by Mapes is admitted. Ownership raises a presumption that the driver was a servant of the city. (*Ferris* v. *Sterling*, 214 N. Y. 249.)

The fact is that Mapes had been working in the highway bureau, placed there by the civil works administration, and that due to his being a chauffeur, he had been driving the secretary's car for some weeks before the accident. As such driver, he was under that official's immediate supervision and control, and took all his orders from him with respect to the operation of the car. To all intents and purposes, Mapes was functioning the same as a regularly employed chauffeur, and did the same work. Certainly, in driving the car, his services did not inherently differ in character from those of a regular employee, civil service or not. The fact that through circumstances beyond his control, he fell in the ranks of the great army of fine, self-respecting men who have come to be known as C. W. A. workers, does not alter his status of a man returning services for pay. Nor does the fact that he was paid wholly by the Federal government affect the question of the existence of a master and servant relationship with the city.

The decisive test is not necessarily the payment of wages but who directs the movements of the worker committing the injury. Such has always been the rule. (*Muldoon* v. *City Fireproofing Co.,*

134 App. Div. 453.) I pass upon the question solely as one of law, the facts as to the employment being conceded. True, Mapes was paid by the Federal institution. It might even be said that he was "employed" by the C. W. A. But it was a general "employment." The Federal agency did not assume to do any particular work for the city. It merely turned over the man, whom it paid, to do such work as the city officials might see fit to give him. When he was assigned to the city's bureau he could be put to work by the city officials in any channel where his services might prove useful. And he was. His calling was that of a chauffeur, and he was so utilized. His conduct was fully controlled by the secretary. For misconduct or inability to perform the work required of him, he could have been discharged or returned to the C. W. A., either by the secretary or the highway bureau, or other proper officials of the city. (*Cunningham* v. *Syracuse Improvement Co.*, 20 App. Div. 171.) There can be no distinction between his situation and that of the familiar case of a servant in the general employment of one master, paid by him and temporarily loaned to another to do the latter's work. In driving the car under the orders of the secretary, Mapes is to be regarded, for the time being, as the city's employee, generally, upon the same footing as any other employee of the city, covered by the Civil Service Law or not, or any other person performing work for the city, except of course, contract work. His assignment to the city bureau is to be treated as a loan of a man, upon the same fundamental principles in legal effect as are involved in many cases daily occurring in the business world.

Whether the secretary exceeded his powers in directing Mapes to transport his relatives, and whether Mapes went beyond the scope of his duties in so doing, is a different question presently to be discussed.

Had the tortious act been committed under circumstances conclusively showing that Mapes and the car were engaged on city business, in the course and within the scope of the employment, as if Mr. Sasse had been in the car in the city's interest, the question of the application of the rule *respondeat superior* would be more directly presented, and there would be no occasion for the claim of *ultra vires*, and it would be held that the municipality is liable, exactly the same as if a regular city employee had been driving. (*Higgins* v. *Western Union Telegraph Co.*, 156 N. Y. 75; *Gorney* v. *City of New York*, 102 App. Div. 259.) (See *Muldoon* v. *City Fireproofing Co.*, *supra*, and cases cited *post*.)

The question has often been before the courts. In *Rourke* v. *White Moss Colliery Co.* (L. R. 2 C. P. 205) the rule was stated by Lord COCKBURN in these words: "But, when one person lends

his servant to another for a particular employment, the servant, for anything done in that particular employment, must be dealt with as the servant of the man to whom he is lent, although he remains the general servant of the person who lent him. The true test in such cases is to ascertain who directs the movements of the person committing the injury."

In *Wyllie* v. *Palmer* (137 N. Y. 248, 257) it was said: " The fact that the party to whose wrongful or negligent act an injury may be traced was at the time in the general employment and pay of another person does not necessarily make the latter the master and responsible for his acts. The master is the person in whose business he is engaged at the time and who has the right to control and direct his conduct. The rule on this subject is well stated by a learned author on the Law of Negligence as follows: ' He is to be deemed the master who has the supreme choice, control and direction of the servant, and whose will the servant represents, not merely in the ultimate result of his work but in all its details. The payment of an employee by the day, or the control and supervision of the work by the employer, though important considerations, are not in themselves decisive of the fact that the two are master and servant. * * * Servants who are employed and paid by one person, may, nevertheless, be *ad hoc* the servants of another in a particular transaction, and that too where their general employer is interested in the work. They may, without consulting their master, but in good faith, assist a person independently employed to do something which shall benefit their master, but with which neither he nor they have any right to interfere, and in which they act entirely under the control of such other person. In none of these cases is the nominal master responsible to strangers for their acts or omissions.' (Shear. & Redf. on Neg. [4th ed.] p. 269.)"

In *Higgins* v. *Western Union Telegraph Co.* (*supra*) the following occurs (at p. 78): " The general rule is that a party injured by the negligence of another must seek his remedy against the person who caused the injury, and that such person alone is liable. The case of master and servant is an exception to the rule, and the negligence of the servant, while acting within the scope of his employment, is imputable to the master. (*Engel* v. *Eureka Club*, 137 N. Y. 100.) But the doctrine of *respondeat superior* applies only when the relation of master and servant is shown to exist between the wrongdoer and the person sought to be charged for the result of the wrong, at the time and in respect to the very transaction out of which the injury arose. The fact that the party to whose wrongful or negligent act an injury may be traced was, at the time in the general employ-

ment and pay of another person does not necessarily make the latter the master and responsible for his acts. The master is the person in whose business he is engaged at the time, and who has the right to control and direct his conduct. Servants who are employed and paid by one person may, nevertheless, be *ad hoc* the servants of another in a particular transaction, and that, too, when their general employer is interested in the work. (*Wyllie* v. *Palmer*, 137 N. Y. 248.)"

Assuming that the car in question had been driven by a regular city employee, on city business (either public or governmental, in view of the new sections of the Highway Law), the city could not be heard to avoid liability. What difference is there if the car is being driven by a temporary or permanent employee?

In *Baldwin* v. *Abraham* (57 App. Div. 67) the Appellate Division of the Second Department had before it a case quite analogous in principle. The question was whether the department store, Abraham & Strauss, was liable for the negligence of a driver who drove a wagon temporarily hired by the store for the holiday trade. The driver and the truck had both been hired to make deliveries, but the driver, though paid by his general employer, was under the orders and control of the store's superintendent as to what deliveries to make, the route, the loading, unloading, etc. It was held, after an exhaustive review of the authorities, per HIRSCHBERG, J., that: " The recent decisions in this State seem to be uniform in the assertion that the true test as to whether the relation of master and servant exists is not necessarily the payment of wages, but is whether at the time of the injury complained of the alleged servant is engaged in the business of the alleged master, and subject to his direction and control."

And further, in overruling the defense that although the hired driver did the same work as the regular drivers, there was no relationship of master and servant, the court used language quite pertinent here: " To say that under such circumstances the defendants would be responsible for the negligence on the public streets of their regular servants, but not for that of those thus temporarily hired, is so repugnant to reason and justice that it would be little short of amazing if it had not found place in the adjudications of the State. It certainly finds no sanction in any authoritative case cited by the appellants' counsel, and those which make the payment of wages the sole test have long since been overruled."

More recently there arose the case of *Schmedes* v. *Deffaa* (153 App. Div. 819), in which the defendant, a livery stable keeper, not having enough carriages of his own, hired one with the driver from another livery stable keeper, and sent him to an undertaker who

in turn directed him to the funeral, during the progress of which the accident occurred. Action was brought against the first livery stable keeper and the complaint was dismissed. The Appellate Division, First Department, affirmed, holding that defendant acted merely as a middleman and was neither the master of the driver nor the one who directed his movements after he had reported to the undertaker. Upon the lucid opinion by MILLER, J., the Court of Appeals reversed (214 N. Y. 675). It was, therefore, finally held that the driver was the servant of the first livery stable keeper, that is, the defendant, to whom the driver had been loaned by the other keeper, and that "The driver was certainly not doing the work of his general employer because the latter had not engaged to do that work. He was not doing the work of the undertaker, because the latter had employed the defendant as an independent contractor to do it. The work, then, was that of the defendant, done by the agencies supplied by him, and subject to his control, except in so far as the undertaker might direct the course of the journey."

In applying the principles of law, Judge MILLER in the above case quotes from *Standard Oil Co. v. Anderson* (212 U. S. 215). He says: "In discussing the proposition that the true test of liability is whether the servant was doing the defendant's work, Mr. Justice MOODY put the case so plainly and his language is so apposite that it will bear repetition. He said ' It sometimes happens that one wishes a certain work to be done for his benefit and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work, and places them under his exclusive control in the performance of it, those men become *pro hac vice* the servants of him to whom they are furnished. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work, and they are for the time his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still in its doing his own work. To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work.' "

Continuing, Judge MILLER adverts that BARTLETT, J., in *Kellogg* v. *Church Charity Foundation* (203 N. Y. 191), referring to the opinion of Mr. Justice MOODY in the *Standard Oil Co.* case, said: " Where one furnishes another with men to do work for him and places them under his exclusive control in its performance those men become *pro hac vice* the servants of him to whom they are furnished and he is responsible for their negligence because the work is his work, and they are his workmen for the time being."

The ruling in the above *Schmedes* v. *Deffaa* case has been very recently (December, 1934) made the basis of the decision in *Irwin* v. *Klein* (243 App. Div. 23) by the Appellate Division, First Department, in which the court, further referring to the *Kellogg* v. *Church Charity* case and *Hartell* v. *Simonson & Sons* (218 N. Y. 345), thus concisely reiterates the rule: " The principles of law which control in this class of actions are well settled. A servant in the general employ of one person, who is temporarily hired or loaned to another person to do the latter's work, becomes, for the time being, the servant of the hirer, who is liable for his negligence. On the other hand, if the general employer enters into a contract to do the work of another as an independent contractor, his servants do not become the servants of the person with whom he thus contracts, and the latter is not liable for their negligence. (*Hartell* v. *Simonson & Sons*, 218 N. Y. 345; *Kellogg* v. *Church Charity Foundation*, 203 N. Y. 191.) "

This leads to a consideration of the issue of *ultra vires* which is the decisive factor of the case at bar. Plaintiff claims that in the event that the city's liability cannot be predicated upon the common-law rule *respondeat superior,* if it be found that Mapes was not driving upon the city's business at the time of the accident, that then section 59 of the Vehicle and Traffic Law and section 282-g of the Highway Law confer a statutory cause of action against the city and render it liable even though the car was being driven outside the scope of employment, so long as it was with the permission of the owner, the city.

While the question whether Mapes was driving in the course and within the scope of his employment when the accident occurred is on the border line, as already stated, I view the testimony of Mr. Sasse and Mapes taken together, in what appears to me to be the more permissible aspect, and I find that in driving the secretary's family the chauffeur while carrying out the order of his superior was not acting within the scope of his duties in that the errand was personal to the secretary and hence to him. This result would follow even if Mr. Sasse had been in the car himself. Had the evidence permitted the inference that the car was being driven to

borough hall for public purposes; that the occupants merely incidentally rode in the car, but that the car would have gone on its journey in any event, with or without the occupants, the city could not escape liability. (*Fox v. Syracuse*, 231 App. Div. 273; affd., 258 N. Y. 550.) As stated by Chief Judge CARDOZO: "We do not say that service to the employer must be the sole cause of journey, but at least it must be a concurrent cause. To establish liability, the inference must be permissible that the trip would have been made though the private errand had been canceled. * * * The test in brief is this: If the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own. (*Clawson v. Pierce-Arrow Motor Car Co.*, 231 N. Y. 273.) If, however, the work has had no part in creating the necessity for travel, if the journey would have gone forward though the business errand had been dropped, and would have been canceled upon failure of the private purpose, though the business errand was undone, the travel is then personal, and personal the risk." (*Matter of Marks v. Gray*, 251 N. Y. 90, 92.)

Where the driver's negligence occurs while he is not upon the business of his employer, no liability on the part of the owner of the car, whether an individual or corporation, could result at common law under the rule *respondeat superior*. (*Rolfe v. Hewitt*, 227 N. Y. 486; *Fluegel v. Coudert*, 244 id. 393; *Carty v. Acker, Merrall & Condit Co.*, 210 App. Div. 789; *Goldberg v. Borden's Condensed Milk Co.*, 227 N. Y. 465; *Psota v. Long Island R. R. Co.*, 246 id. 388; *Marconi v. Vecci*, 223 App. Div. 858; affd., 251 N. Y. 567.) The same is true where a municipality stands in the relation of master and servant with respect to the operation of a vehicle. (*Cohen v. City of New York*, 215 App. Div. 382 [First Dept.]; affd., 243 N. Y. 561; *Downing v. City of New York*, 219 App. Div. 444 [First Dept.]; affd., 245 N. Y. 597; *Fox v. City of Syracuse* 231 App. Div. 273 [Fourth Dept.]; affd., 258 N. Y. 550.)

Nor could a recovery against the city be based upon the statutory provisions cited. Section 59 of the Vehicle and Traffic Law, so far as applicable, reads:

" § 59. Negligence of operator other than owner attributable to owner. Every owner of a motor vehicle or motor cycle operated upon a public highway shall be liable and responsible for death or injuries to person or property resulting from negligence in the operation of such motor vehicle or motor cycle, in the business of such owner or otherwise, by any person legally using or operating the same with the permission, express or implied, of such owner."

The words " every owner " include a municipality, subject to the limitation that the use be legal and within the scope and limits of the municipality's permission, and that it have legal power to grant such permission. (*Kelly* v. *City of Niagara Falls*, 131 Misc. 934.) Whoever may own a motor vehicle is within the scope of the statute.

It has been definitely held that this section 282-e did not change any of the common-law rules of liability, " that is, it did not extend the liability of the master for the acts of his servant." (*Psota* v. *Long Island R. R. Co.*, 246 N. Y. 388, 393; *Fluegel* v. *Coudert*, 244 id. 393.)

Under this statute, however, the consent of the owner to the use of the car by his chauffeur for the chauffeur's own purposes, not in the owner's business, renders the owner liable for damages inflicted. This is so because " liability is no longer dependent upon use or operation by a servant in the ' business ' of a master. Liability is dependent upon legal use or operation in business ' or otherwise ' with permission or consent." (*Fluegel* v. *Coudert, supra* at p. 394.)

At this point we encounter an insurmountable difficulty in the path of plaintiff's case against the city. The borough secretary concededly directed the driver to make the trip which has been found to be outside the scope of his employment. In so operating the car the driver used it " legally " in the sense that he did not convert it to his own uses without permission or contrary to the owner's instructions. His use of the car was lawful and proper, in obedience to the command of his superior. (*Fluegel* v. *Coudert, supra; Psota* v. *Long Island R. R. Co., supra.*) Had Mr. Sasse been a servant of any individual or corporation owning the car, and not a servant of a municipality, his directions to the driver would have constituted the owner's consent under section 59 of the Vehicle and Traffic Law (*Plaumbo* v. *Ryan*, 213 App. Div. 517), and the situation would not differ from the one where the owner is personally in the car (*Gochee* v. *Wagner*, 257 N. Y. 344), or where the owner loans the car to his nephew for the latter's personal use and the nephew in turn allowed another to drive in his presence (*Arcara* v. *Moresse*, 258 N. Y. 211), in both of which cases the negligence was imputed to the owner.

But here the borough official had no power to permit the use of the car, though legal, for private purposes. The official's directions to the driver and the latter's act in obedience thereto were both *ultra vires* acts, which cannot be made the basis of liability on the part of the city. The secretary's orders, while impelling the driver to action, were not binding on the municipality. When the borough

official, by directing, and the driver by performing, the physical act, deviated from the city's business by undertaking the private errand, that constituted an abandonment of the city's business and an engagement upon an unauthorized transaction of their own, for the results of which no liability may be imposed upon the city. Such is the doctrine of the law repeatedly stated, in construing the effect of the statute in question, with respect to the liability of a municipal corporation. (*Aspinall* v. *City of New York*, 221 App. Div. 753 [Second Dept.]; affd., 246 N. Y. 644; *Downing* v. *City of New York, supra; Fox* v. *City of Syracuse, supra; Fox* v. *Employers' Liability Assurance Corporation,* 243 App. Div. 325.)

Section 282-g of the Highway Law, cited by both parties, does not apply to the facts at bar, for the reason that that statute refers to the governmental powers of a municipality, in which respect it has created a cause of action where none existed at common law, annulling the rule on non-liability within the field of duties of governmental character, such as public charities, health, fire and police protection. No such element is involved here. The duties in which the city's servants were engaged were of a corporate nature.

In support of his argument that C. W. A. workers are not " employees " and that no master and servant relationship arises because of the " made work " as to them, the corporation counsel refers to workmen's compensation statutes and points out that under them it has been held in several jurisdictions that such workers are not covered by their provisions. The questions do not appear to have been passed upon as yet by the appellate courts of this State. However that may be, the question whether as between him and the person whose work he does, such worker is entitled to compensation benefits is quite different from the one of liability on the part of one standing in the relation of master to third persons. There can be no analogy.

In the case at bar the driver was paid by the Federal administration, and was working for the local government. If the case should arise in which the C. W. A. workers are paid entirely with city funds, the source of the pay would not be involved, and the question would be simply one of whether such a worker is an employee, and in the same position, with respect to tortious acts, as any other employee. I have no doubt that the legal status is the same, and that so long as the man is upon the city's business, whether the business is of a temporary nature, and whether regular or special, liability follows. An illustration readily occurring is the case of snow shovelers who are hired year after year for the special purpose. No one would seriously contend that because he is not a regular

employee that his negligent act would not render the city liable in a proper case. I can see no basis for the distinction, however laudable and humanitarian the city's purpose may be in providing special work for the unemployed.

In view of my conclusion that no negligence has been established on the part of defendant Mapes, it follows that judgment must be. and hereby is, granted in favor of both defendants.