5 N.Y.2d 404 (1959)
Alexander Rosensweig, as Administrator of The Estate of George Flores, Deceased, Appellant,
v.
State of New York, Respondent. (Claim No. 31049.)
Court of Appeals of the State of New York.
Argued November 7, 1958.
Decided April 9, 1959.
Jacob D. Fuchsberg, Abraham Fuchsberg and B. Hoffman Miller for appellant.
Louis J. Lefkowitz, Attorney-General (Paxton Blair of counsel), for respondent.
Judges DESMOND, FROESSEL and VAN VOORHIS concur with Judge FULD; Judge DYE dissents in an opinion in which Chief Judge CONWAY and Judge BURKE concur.
*406 FULD, J.
Knocked out by Roger Donoghue in the eighth round of a bout held in Madison Square Garden on August 29, 1951, following two very hard blows to the head, George Flores died several days later of cerebral hemorrhage and cerebral edema. This suit for wrongful death followed, it being alleged by his administrator that the State of New York was negligent in licensing and permitting Flores to fight when it knew, or should have known, that he was not in proper physical condition to engage in the fight. Flores had participated in two earlier fights, one on July 24, the other on August 14 (also against Donoghue), and each had come to an end when Flores suffered a technical knockout. The claim of negligence is based on the hypothesis that death was not the result of the blows received *407 in his last fight, but rather the aggravation of a brain injury previously suffered, which should have been detected by the doctors, assertedly employees of the State, who found him physically fit to fight.
Flores had been examined before and after each of the fights by physicians selected, the record indicates, by the corporation promoting the matches from a panel set up by the Medical Advisory Board of the New York State Athletic Commission. The doctor who examined him after the conclusion of the first fight, on July 24, found him "O.K." Dr. Bockner, who was at the second fight, examined him twice, several hours apart, before the match got under way and described his "physical condition [as] perfect." Then, after the fight had been stopped, the doctor again examined him twice  in the ring immediately after the knockout and, the second time, a half hour later, in his dressing room. Observing that Flores had suffered no cuts, no bruises and no concussion and that his heart, his system and reflexes were all "perfectly normal," Dr. Bockner expressed the opinion that he "left the ring in good shape and * * * could continue to fight." When application was made for Flores to take part in a match to be held on August 29, an electroencephalogram (EEG) was ordered as a precautionary measure and Flores was considered "suspended" until the results of the encephalogram became known. One was taken and it revealed no abnormality and was interpreted as "normal" and "generally good"; although it did indicate a "slowing anteriorly", that was not significant, it was said, because no earlier tracing was available for comparison.
The physician present at the last fight was Dr. Nardiello. Aware of Flores' earlier technical knockouts, the doctor testified that he not only "spen[t] a lot of time with him," subjecting him to a thorough physical examination shortly before the bout began, but that he also studied the reports of the other doctors and the electroencephalogram taken some days before. Based on all this, it was Dr. Nardiello's opinion that Flores was "in excellent condition." Indeed, it was his view  as well as of Donoghue, Flores' opponent  that he met his death as a result of injury sustained during the fight itself; the blow, a devastating one, was a left hook to the head, a "hard * * * solid punch," "with [Donoghue's] *408 full weight behind it," "perfectly timed and perfectly thrown."
Flores went into a coma some hours after the fight. A brain operation was performed which was unsuccessful in saving his life. The surgeon who performed the operation, Dr. Daniels, testified that he observed "no scar tissue" and "no evidence" of any "injury pre-existing the injury" received in the ring during the August 29th bout, but he voiced an opinion, in answer to a hypothetical question, that Flores may have sustained a concussion before that date. Dr. Helpern, the medical examiner who performed the autopsy, stated that he found no indications of any prior injury.
On the other hand, Dr. Somberg testified that, based on his examination of the medical record, it was his opinion that Flores had received injuries in the earlier contests and that death was caused "by the damage that he took" in those fights, "plus the damage in the third fight, plus the damage of his head striking the canvas." Dr. Somberg also asserted that it was better medical practice that a boxer severely beaten about the head should not fight again for six weeks or two months.
The Court of Claims awarded the claimant $80,000; it was its view that the doctors who examined Flores were servants of the State and that they were negligent in not discovering that he had suffered a brain injury before his last fight. Upon appeal, the judgment was reversed and the claim dismissed. Although it expressed a "serious doubt" as to whether the doctors were employees of the State, the Appellate Division found it unnecessary to decide that question, holding that, even assuming the existence of an employer-employee relationship, the claimant failed to establish either negligence or causation.
Our approach is different. We choose to place our decision on the ground not decided by the Appellate Division and, accordingly, we do not pass upon the issue of negligence. Study of the problem persuades us that the doctors were not employees of the State and, consequently, even if they were careless, their negligence could not in any event be imputed to the State.
Although this State has wisely waived its sovereign immunity against suit generally (Court of Claims Act, § 8) and, perhaps, *409 "more completely than any other American jurisdiction" (Herzog, Liability of the State of New York for "Purely Governmental" Functions, 10 Syracuse L. Rev. 30), it is essential, at the very least, that the person for whose negligent conduct the State is sought to be charged be engaged in its service. The doctors who examined Flores were, quite obviously, not employees of the State, but it is suggested on behalf of the claimant that an intention on the part of the State to assume liability for the acts of these doctors is to be found in the legislation relating to boxing. Analysis of the statute, however, as well as its history, demonstrates the contrary.
"The common law of New York," it has been noted, "placed no bar on the holding or conduct of [boxing] matches." (Zwirn v. Galento, 288 N.Y. 428, 432-433.) However, for many decades the penal laws of this State contained a complete prohibition of prize fighting (L. 1856, ch. 98; Penal Code [L. 1881, ch. 676], § 458; now Penal Law, § 1710). Its reintroduction dates from 1911, when the Legislature passed a law permitting boxing exhibitions to be resumed under stringent regulations, subject to the supervision of a newly created State Athletic Commission, and provided that the contests were to be excepted from the ban of the penal laws (L. 1911, ch. 779). The objectives of this legislation were well described by Justice SEABURY, as he then was, a few years after its enactment in Fitzsimmons v. New York State Athletic Comm. (15 Misc 2d 831, 833, affd. 162 App. Div. 904):
"Confronted with the question as to whether it should prohibit prize fighting or sparring altogether, or leave such contests unaffected by legislation, the law-making body of this State has adopted a middle course and has legalized boxing when conducted under State control. Two main purposes have prompted such legislation: First, the desire to prevent as far as possible certain brutal and degrading features which have in the past sometimes attended such contests, and, second, to promote and protect such contests when conducted within the legitimate limits of a sport. To achieve those purposes the state has created the Athletic Commission and authorized that commission to prescribe stringent rules governing the conditions under *410 which such contests can be held. * * * Reading [the] two statutes together, it is apparent that the vocation of prize fighting or sparring is an occupation subject to governmental control."
Further elaboration occurred with the enactment in 1920 of the so-called Walker Boxing Law which, continuing the State Athletic Commission, has remained on the books without any fundamental changes to the present time (L. 1920, ch. 912, as amd. by L. 1948, ch. 754; L. 1952, ch. 666). The statute, exceedingly broad in its coverage, provides for rigid supervision of the premises in which the matches or exhibitions are held, of all who participate in the exhibitions in any capacity and of the methods of conducting the matches. The primary means employed to effect enforcement is a system of licensing, with exclusion of the unlicensed and power to penalize the licensed for violations or infringements. The standards imposed by the statute, it is provided, may be implemented by regulations promulgated by the commission, a power, we note, which has been frequently exercised.
The statute itself reflects a high concern for the physical fitness of the fighters scheduled to engage in the matches. Such fitness will, of course, enhance the competitive character of the contest and it may fairly be assumed that the Legislature was at least as concerned with the physical welfare of the contestants themselves. Accordingly, the statute, as it read in 1951 when the fight took place, prescribed that "All boxers must be examined by a physician designated by the commission before entering the ring" (§ 23, as amd. by L. 1948, ch. 754, § 5 [now § 25]), that a physician must be "in attendance at every boxing * * * match" (§ 13, as amd. by L. 1948, ch. 754, § 3 [now § 26]) and that a report of physical examinations must be filed by the corporation promoting the match "not later than twenty-four hours after the termination of the contest" (§ 23, as amd. by L. 1948, ch. 754, § 5 [now § 25]).[1] The doctors so employed are selected from a list of "qualified physicians" recommended to the commission "from time to time" by its Medical Advisory Board, a body consisting of *411 nine members appointed by the Governor (§ 12-a, as added by L. 1948, ch. 754, § 2 [now § 4]; § 13, as amd. by L. 1948, ch. 754, § 3 [now § 26]). The board also recommends to the commission the fees for such physicians which are to be paid by the promoting corporation (ibid.). In addition, the board "from time to time" is to submit to the commission for approval "such additional regulations and standards of examination as in their judgment will safeguard the physical welfare of professional boxers * * * licensed by the commission" (§ 12-a, subd. 2, as added by L. 1948, ch. 754 [now § 4, subd. 2]).
Turning more directly to the action before us, the only negligence charged or found is that of the doctors who conducted the examination of Flores. But, on the plainest principles of construction, the State has carefully avoided making these physicians its own servants or employees. It is true that the State established the panel  which now consists of some 60 doctors, half of whom are in the New York City area  but this is only the customary exercise of the police power in the regulation of a permitted subject. All persons require a license to practice medicine in this State, and the establishment of a limited number of such doctors to perform a specialized service is no more than similar selection for other subjects of specialization, such as psychiatry.
To be sure, the corporation promoting the contest was required to employ for this purpose a physician included on the panel. This, without more, is a phenomenon of everyday occurrence. No one would seriously suggest that every person to whom the State has issued a license to practice his profession or trade thereby becomes an employee or agent of the State. Nor is such a relationship created by virtue of the fact that the State may also prescribe the amount of the fee to be charged; regulation, no matter how close or stringent, is not thereby transmuted into government operation. Indeed, where the employment is made mandatory, it is not uncommon to prescribe the fee in order to prevent gouging. It is a familiar experience to many that only specially licensed tow trucks are permitted to come to the assistance of motorists on certain highways and that the towing fee is prescribed. By so doing, the authorities do not make themselves responsible for the manner in which the service is performed.
*412 There is nothing in the Walker Boxing Law or in the Rules of the State Athletic Commission which suggests that the examining doctors, paid by the promoting corporation, are servants of the State or, in performing their duties, are subject to control or supervision by the commission. The plain fact of the matter is that, however stringent the requirements, the scheme embodied in the statute is solely a regulatory measure. Every such regulatory statute presupposes public purposes. The Legislature evidently considered that the reduction in the risk of permanent injury to fighters constituted such a purpose, and that was its right. There is no indication, however, that there was any design to transfer such risks to the State. By providing a safeguard through the requirement of a physical examination, the State did not undertake to insure that it would always be effective. It is difficult to conceive that the Legislature, in enacting the statute, ever considered the possibility that these doctors could be deemed servants of the State for whose negligence it would be held responsible. Precisely similar requirements are imposed for referees and judges whose fees are likewise prescribed by the commission (§§ 1, 7; Rules of Commission, former rule 41 [N. Y. Off. Comp. of Codes, Rules & Regulations, Vol. 2, p. 1220], now rule F, § 11 [N. Y. Off. Comp. of Codes, Rules & Regulations, 8th Off. Supp., p. 540]), and yet it could hardly be claimed that the State would be answerable in damages if, for instance, a referee negligently failed to terminate a bout. The State adopted a parallel scheme when it created the State Harness Racing Commission (Pari-Mutuel Revenue Law [L. 1940, ch. 254, as amd.], art. II, § 35 et seq., particularly §§ 41, 41-a, added by L. 1953, ch. 391, § 8) and, if the claimant's position were here upheld, all racing officials who are licensed and have their compensation fixed by that commission would, by a parity of reasoning, become servants of the State. Such an enlargement of public employment should be made consciously if it is intended. Regulation is ordinarily regarded as a means of avoiding governmental operation, rather than a subtle embodiment of it. (See, e.g., Lavitt v. United States, 87 F.Supp. 149, affd. 177 F.2d 627.)
In other words, although the State has by these measures sought to make a dangerous sport less dangerous and, indeed, may have retained a limited power of supervision over the *413 physical examinations provided for, that does not mean that the Legislature constituted the examining doctor a servant or employee of the State so as to render it liable for his negligent act. It is probable that, even in a purely private context, persons situated as are these doctors would be held to be "independent contractors," for whose independent negligent acts the party requesting the performance of the service would not be responsible. (Cf. Broderick v. Cauldwell-Wingate Co., 301 N.Y. 182, 187, and Moore v. Wills, Inc., 250 N.Y. 426, 428-429 [general contractor not liable for independent negligent act of subcontractor].) However that may be, though, we reject the novel thesis that a person may be a "constructive" state agent. Agency cannot be thrust upon the State against its will and only the Legislature can authorize persons to perform services for the State as its servants, and this the Legislature carefully refrained from doing in the case of these doctors. Although we have come upon no decision by a New York court in which the contention urged by the claimant has been advanced, an argument not too unlike it was considered and rejected in a case arising under the Federal Tort Claims Act. (See Lavitt v. United States, 87 F.Supp. 149, 150-151, affd. 177 F.2d 627, 630, supra.)
In the view which we have taken, we do not reach the question of the State's responsibility if the doctors had been in its employ (see Herzog, op. cit., 10 Syracuse L. Rev. 30, 36-38). We rest our decision solely on the ground that, since the physicians who examined Flores were not employees or agents of the State, no suit may be maintained against it for their alleged negligence.
The judgment appealed from should be affirmed, without costs.
DYE, J. (dissenting).
On September 3, 1951 the claimant's intestate, George Flores, a professional fighter, died from injuries he received in a prize fight held in Madison Square Garden on August 29, 1951. His administrator, the appellant herein, filed this claim for wrongful death against the State of New York alleging that the State, acting through its duly authorized agency, the State Athletic Commission and its Medical Advisory Board (L. 1920, ch. 912, as amd.), was negligent in issuing its *414 license for the fight in question. The negligence claimed is based on the circumstance that, prior to the fatal fight and on July 24, 1951 and on August 14, 1951, the decedent had participated in two boxing matches in each of which he suffered a technical knockout (TKO); that, because of these prior beatings, he was rendered so physically unfit as to make it unsafe and improper for him to engage in the match in question, all of which was known to the examining physician, and that to license him to fight under such known circumstances subjected him to a serious and unwarranted risk.
Following a long trial the Court of Claims (YOUNG, J.) made an award in favor of claimant in the sum of $80,000, it having found that the negligence of the examining physician was attributable to the State and rendered the State liable in the premises; that the decedent did not assume the risk of the State's negligence and was not contributorily negligent.
The Appellate Division reversed the judgment entered on the award and dismissed the claim on the general ground that, even though it be assumed that the examining physician was an employee of the State (which it doubted), the issuance of the license under the circumstances was no more than an error of judgment on the part of the examining physician for which the State is not liable (St. George v. State of New York, 283 App. Div. 245, affd. 308 N.Y. 681).
In New York, all prize fights and boxing exhibitions are illegal except those authorized by the so-called Walker Boxing Law (L. 1920, ch. 912, as amd.). The purpose prompting such legislation was "to prevent as far as possible certain brutal and degrading features which have in the past sometimes attended such contests, and, second, to promote and protect such contests when conducted within the legitimate limits of a sport." (Fitzsimmons v. New York State Athletic Comm., 15 Misc 2d 831 [SEABURY, J.].) To achieve these worthy purposes, the Legislature created the State Athletic Commission with power to promulgate stringent rules governing the conditions under which fights can be held and gave exclusive control of every phase of the sport, including its personnel, through a system of bonding, licensing and penalties. A license to fight or conduct a fight is a privilege and not a right (Matter of London Sporting Club v. Helfand, 3 Misc 2d 431; Matter of Christensen v. Helfand, 208 Misc. 302). *415 By express provision of law, licenses may be withheld by the commission whenever the participants fail to meet certain standards as to character and general fitness (§ 12, as added by L. 1952, ch. 666, § 11). To make sure that the fighters participating in boxing matches are physically fit, and for the purpose of safeguarding their physical welfare, a Medical Advisory Board has been created consisting of nine licensed physicians of at least five years' experience in practice, appointed by the Governor, whose duty it is, among others: "to prepare and submit to the commission for approval regulations and standards for the physical examination of professional boxers and wrestlers. The board shall continue to serve in an advisory capacity to the commission and from time to time prepare and submit to the commission for approval, such additional regulations and standards of examination as in their judgment will safeguard the physical welfare of professional boxers and wrestlers licensed by the commission. The advisory board shall recommend to the commission from time to time such qualified physicians, for the purpose of conducting physical examinations of professional boxers and wrestlers, and other services as the rules of the commission shall provide; and shall recommend to the commission a schedule of fees to be paid to physicians for such examinations and other services as required by this act." (§ 4, subd. 2, as amd. by L. 1952, ch. 666, § 4.)
Pursuant to such authorization, the Medical Board recommended to the commission a list of qualified physicians for the purpose of conducting physical examinations of boxers and wrestlers. It is from this panel that the names of the physicians who made the several examinations of the decedent Flores were selected. While, ostensibly, the corporation had a choice, in practice, it worked out that the examinations were invariably made by the same physicians. In this instance, Dr. Vincent Nardiello, a licensed physician, had been on the panel since 1932, from 1934 had received most of the Madison Square Garden assignments and, since the death of Dr. Walker, had received most of the assignments for the Madison Square Garden and the St. Nicholas Arena. A routine pattern is followed: The main bout fighters are examined five days before a fight, again on the night of the fight and the physician attends all fights and, on occasion, examines a fighter afterwards. Under such a *416 restricted set-up, both as to duties involved and the limitations on the personnel charged with the performance of such duties, it seems obvious that the State retained such a close and exclusive direction and control over the physical examinations of the boxers and the physicians who made the examinations as to render the State liable for the negligent performance of the duties imposed. Nothing turns on the circumstance that the physician's examining fee was paid by the corporation. That is not enough to relieve the State of the responsibility incident to control. The amount of the fee, we must remember, is also fixed by the regulation and seems to be treated as a cost of doing business rather than a measure of the value of the service rendered (Rules and Regulations of State Athletic Comm., former § 41 [N. Y. Off. Comp. of Codes, Rules & Regulations, Vol. 2, p. 1220]). Neither the corporation nor the boxer had any choice in the matter. Neither could select a physician of his own choice. The examination was not made at the request of either, but by direction of the commission, the members of which relied on the report in determining whether to allow or forbid the fight. Such a situation falls within the well-established proposition that the true test of the relationship of master and servant is not who pays the wages but whether, at the time of the injury complained of, the alleged servant is engaged in the business of the master and subject to his direction and control (Baldwin v. Abraham, 57 App. Div. 67, affd. 171 N.Y. 677; Bartolomeo v. Bennett Contr. Co., 245 N.Y. 66; Callahan v. Munson S. S. Line, 141 App. Div. 791).
So viewed, the Court of Claims correctly found as matter of fact and law that the designated examining physicians for purposes of the examination were employees of the State.
I now turn to the issue of negligence. The Court of Claims has found as a fact that, in permitting Flores to fight, the doctors were negligent. All of the medical witnesses agreed that possibility of injury to the brain, such as a concussion, had always to be considered and good medical practice requires that persons who had received a severe beating in and about the head should be kept quiet for a period of from six to eight weeks, and that this was dictated even in the absence of objective neurological signs of head injury.
*417 On August 29, 1951 Dr. Nardiello examined Flores along with nine other contestants on that evening's fight card. The examination of Flores took 10 to 15 minutes, consisting in part of the answers made by Flores to a written questionaire which he signed and a complete physical examination by the physician. Dr. Nardiello testified in substance that when he interviewed Flores and was told by him that he had lost his last two fights by TKO, he said to him: "`What are you fighting for?' Then I went inside to get the records." He considered the records important "because of the TKO, I figured he should have a rest". It was his experience that "if a man gets a bad beating around the head or is knocked out, to take a rest for two months and have EEG taken; that's the electroencephalogram."
The records of the previous fights were available. At the Flores-Cerky fight on July 24, 1951 at Fort Hamilton Arena, Flores had been examined by Dr. Swetnick, panel doctor; during the second round Cerky had hit Flores a series of hard blows to the face knocking out his mouthpiece and reducing Flores to a "helpless" or "lifeless" state, causing the referee to stop the fight by a TKO ruling. Three weeks later, on August 14, Flores fought Roger Donoghue at White Plains. At that time he was examined by Dr. Bockner, a panelist, who made the usual routine physical checkup and reported that his physical condition was good and that it was permissible for him to fight that night. It was a hard fight. Donoghue was a tough fighter described as a "turned-around southpaw" with a powerful left hook. Flores was somewhat shorter by about four inches. In the eighth round Donoghue landed a blow to the head that caused Flores to stagger. Donoghue knew he "had him" and followed with a series of fast blows. Flores was on the ropes. He collapsed and the referee stopped the fight, declaring Donoghue the winner by a TKO. Flores revived and left the ring. He was described as "groggy". Dr. Bockner was present from the beginning of the fight and after the TKO he went to Flores' corner, asked him how he felt and examined his eyes. About 20 minutes later, he again examined him in the dressing room and found his pressure, heart, hands and reflexes normal and that, in his opinion, he had suffered no concussion and he so reported to the commission.
*418 On the following day Flores' manager asked the Deputy State Athletic Commissioner, Duberstein, for a rematch with Donoghue. Duberstein then talked with Dr. Bockner on the telephone, following which he advised Duberstein that Flores could not fight until he had had an EEG taken. An EEG was taken on August 16, a report of which is in the file and contains the comment: "This is a generally good record. However, there is some slowing anteriorly. Impression normal record". Upon receipt of this report, Duberstein lifted the suspension and advised his manager that they could go ahead with the rematch which was then set for August 29th. The Flores-Donoghue rematch started at about 9:30 P.M. The fighters were about evenly matched, although it looked as though Donoghue would win on points. In the fatal eighth round, Donoghue landed a right-hand punch to the mouth, followed by a left hook to the chin, which Donoghue described: "I nailed him perfectly". In falling, Flores hit the floor "buttocks first before the shoulders; then the shoulders; then his head". Flores took the count but revived and walked to the dressing room. There, he went into a deep coma from which he never regained consciousness. He was rushed to a hospital for an emergency operation. It was unsuccessful. Flores died three days later (September 3). In describing the operation, Dr. Daniels, a well-known neurosurgeon, said he found no massive hemorrhage, which ruled out the possibility that a single blow had caused the final injury. There was, however, a small hemorrhage underneath the dura mater, which is described as the outermost membrane covering the brain within the skull. There was some evidence of injury to the outer surface of the brain, the cortex. Most significant, however, was the presence of brain swelling, which could not be accounted for so soon after the fight occurring only two hours before. The presence of this swelling could only be accounted for by an injury sometime prior thereto, such condition necessarily leading to the conclusion that Flores had this condition when he went into the fight with Donoghue which, in the light of good practice, the EEG and, from his own experience, Dr. Nardiello should within reasonable limits have anticipated. This is so, even though Flores did not show any objective symptoms at the time he was examined on August 29. All of the medical men agree that injury and damage could exist without such *419 symptoms. Dr. Nardiello knew from the record that Flores had suffered two TKOs in succession in less than a month's time; that in each instance he had taken a severe beating to the head; both Dr. Swetnick and Dr. Bockner knew that it was good practice to lay off a fighter for a rest of from six to eight weeks. Dr. Nardiello knew it too. He had the records, the experience and the power to suspend, but, for some reason best known to himself, he did not go behind the prior examinations, but chose to limit his report to what he himself observed on August 29.
Under the circumstances, as Judge YOUNG pointed out, "Dr. Nardiello had a positive duty to report and act upon whatever his knowledge and experience told him were Flores' disabilities, regardless of the time of their origin. We cannot conceive what would make Dr. Nardiello think that his examination was only limited to disabilities incurred since the last physical examination. We believe that Dr. Nardiello's knowledge and experience told him that Flores had no right to be fighting on August 29th. No possible concept of his duty can excuse his failure to inform the State, if not Flores, of his judgment." While nothing particularly turns on it, Flores' fight record which is among the papers does throw light on the highly commercialized aspects of the fight game. It begins with a fight on March 2, 1950. Between then and December 23, 1950, he engaged in 15 other fights, an average of two fights a month. From January 13, 1951 to the fatal fight on August 29, he again fought eight times. He was 20 years of age, rugged and, no doubt, ambitious but even so he was being driven at a pretty fast pace, even for a fighter.
As trier of the fact, the Court of Claims was justified in finding that good medical practice demands a layoff for boxers who have suffered a knockout or a severe beating about the head from six weeks to two months; that, in face of such fact, it was negligent for Dr. Nardiello to certify Flores as fit to fight on August 29, 1951. This was not an error in judgment, as the Appellate Division has indicated, but was a failure to give proper heed and consideration to obvious medical facts and practices. The examination is primarily to make sure that the fighter is in good physical condition before entering the ring. Dr. Nardiello was fully cognizant of this responsibility, since he knew it was good practice to lay off six to eight weeks after a technical knockout and he freely admitted that he had the *420 authority to prevent Flores from appearing in the ring. His negligence was the negligence of the State. The State has complete and exclusive control of boxing matches. This fight could not have taken place without its approval. The State, having conferred upon its Athletic Commission broad and exclusive powers to regulate and conduct prize fights, it follows that any negligence in the performance of the duty thus imposed becomes the responsibility of the State.
I vote to reverse the judgment appealed from and to reinstate that of the Court of Claims, with costs.
Judgment affirmed.
NOTES
[1] The several sections were renumbered in 1952 and subjected to slight amendments in language (L. 1952, ch. 666).